BOARD OF INSURANCE COMMISSIONERS OF TEXAS
(HOUSTON BANK & TRUST COMPANY ET AL)
V. GREAT SOUTHERN LIFE INSURANCE COMPANY ET AL.

No. A-2886. Decided May 2, 1951.
Rehearing overruled June 13, 1951.
(239 S. W., 2d Series, 803.)

*Price Daniel,* Attorney General, *David B. Irons, Ned Mc-daniel,* and *E. Jacobson,* Assistant Attorneys General, for petitioners.

The Court of Civil Appeals erred in holding that the life insurance features of the Texas Bankers Association Retirement System do not constitute group life insurance and Article 4764a has no application thereto. Trawalter v. Schaefer, 142 Texas 521, 179 S.W. 2d 765; Cousins v. Sovereign Camp W.O.W., 120 Texas 107, 35 S.W. 2d 696; Wortham v. Walker, 133 Texas 255, 128 S.W. 2d 1138.

*Vinson, Elkins Weems and R. Richard Roberts* for Great Southern Life Ins. Co.; *Lawler & Childress* and *Virgil Childress*, for Texas Bankers Association; *Fulbright, Crooker, Freeman & Bates, Leon Jaworski, Chas. W. Bell,* and *Austin C. Wilson,* for Houston Bank and Trust Company, Trustee, all of Houston, for respondents.

In rebuttal to petitioners proposition. Cox v. Payne, 107 Texas 115, 174 S.W. 817; Houston E. W. T. Ry. Co. v. Campbell, 91 Texas 551, 45 S.W. 2; Gulf, C. & S. F. Ry. Co. v. Dwyer, 84 Texas 194, 19 S.W. 470.

MR. JUSTICE CALVERT delivered the opinion of the Court.

On July 28, 1948, Texas Bankers Association—hereafter referred to as "Association" or "Bankers Association"—entered into a written trust agreement with Houston Bank & Trust Company, hereafter referred to as "Trustee". Under the terms of the agreement a retirement plan and pension trust to become effective November 1, 1948, was created for the benefit of the employees of member banks of Association desiring to participate and Houston Bank & Trust Company was appointed trustee to administer the plan. Contributions to the trust fund were to be made by each participating bank from its own funds or, at the option of the bank, from funds jointly provided by the participating bank and its participating employees. If the contribution by a participating bank was entirely from its own funds, all of its employees were required to participate in the plan. If the participating bank required that its employees provide a part of the contribution it was mandatory that at least 80% of those then employed and that all those subsequently employed should participate.

From the funds contributed the trustee was directed to purchase upon the life of each participant, and to pay all premiums thereon, life insurance in the fact amount of $1000.00 for each $15.00 of monthly life income which the formula of the plan prescribed for such participant to receive from the issuing company at his normal retirement date. All life insurance purchased was required to "be in the form of individual ordinary life insurance policies" and each policy was required to contain a clause permitting "the legal owner thereof" to convert the policy to a retirement income endowment or a retirement income annuity basis. Title to every such contract was vested in the trustee and the trustee was given broad powers to exercise any of the rights, options or privileges of the absolute power, subject only to such limitations as were contained in the trust instru-

ment. The trust agreement was not to become binding upon the parties until banks having in the aggregate not less than 500 employee-participants had become signatories thereto.

After the trust agreement had been put in final form, Thomas E. Hand, Pension Trust Consultant of the Association, made an effort to secure an insurance company to underwrite the necessary insurance. Great Southern Life Insurance Company—hereafter called "Great Southern"—was invited to bid and was asked to make its bid on a "no selection" or waiver of all medical consideration basis. In order to enable Great Southern to determine whether it wished to underwrite the insurance on a no selection basis, Hand furnished the actuary of that company a work sheet of actuarial data on the employees of 100 banks.

On August 5, 1948, A. F. Mitchell, Vice President and Actuary of Great Southern wrote the Association a letter of commitment in which Great Southern agreed "to accept without selection" those employees eligible to be in the plan subject to certain conditions which may be briefly stated as follows: 1. The plan of insurance was to be Great Southern's regular Ordinary Life policy with conversion privileges at age 65 and no employee over age 60 years and six months would be accepted. 2. The effective date of the plan was to be November 1, 1948, and the policies dated as of that date. 3. Great Southern would furnish forms of application which were to be completed and mailed to Great Southern by December 31, 1948. 4. Issuance of insurance without selection was conditioned on receipt by Great Southern of applications on at least 500 lives or at least $1,000,000 of insurance by December 31, 1948. 5. Receipt of applications from at least 80% of the employees of each bank was required before any employee of that bank was eligible. 6. To be eligible for insurance without selection each employee must have been at work engaged in his regular duties for at least 30 days prior to the effective date of the plan; or, if an employee was not at work on the effective date on account of illness, he would be made eligible by his return to work able to perform his regular duties. 7. New eligible employees of participating banks would be added, without selection, each year as of November 1st. Consideration would be given to acceptance of employees of banks which elected after 1948 to participate. 8. A maximum amount of $10,000 would be accepted on one life without selection; a greater amount would be accepted only on evidence of insurability. 9. Applications would be received until December 31, 1948, but no insurance was to go into effect until at least 500 applications or applications for at least $1,000,000

of insurance were received. 10. In the event of the death of a participant, Great Southern would allow a pro rata refund of the unearned premium. 11. The agreement was to remain in force for five years and at the end of that period would be subject to review and renewal.

The offer of Great Southern was accepted by the Association and the trust agreement was thereafter amended to conform to the requirements contained in the letter of commitment. Pursuant to the agreement Great Southern prepared a special form of application to be used by eligible and participating employees, and, applications having reached more than $1,000,000 in insurance, issued and delivered to Trustee a separate policy of ordinary life insurance for each applicant. The policies were held by Trustee and certificates of beneficial interest were delivered to the employees. Each of the policies was identical in form with that approved by the Board of Insurance Commissioners—hereafter referred to as "Board"—and used by Great Southern for insuring the lives of individuals, except that attached to the policies and forming a part thereof was a supplemental provision reading as follows:

"C O N T R O L

"In accordance with the request of the Insured, who is a qualified participant in Texas Bankers Association Retirement System, it is understood and agreed that the right to receive all cash values, loan and other benefits accruing under this policy, the right to change the Beneficiary, to assign this policy, to exercise all privileges and options contained herein, and to agree with the Great Southern Life Insurance Company for any release, modification of, or amendment to this policy, shall belong, and be available without the consent of any other person, to Houston Bank & Trust Company, Trustee, its successors or successor in Trust, under all of the terms and conditions of that certain pension trust agreement entered into by and between the said Houston Bank & Trust Company and Texas Bankers Association as of November 1, 1948, as the same may hereafter be amended."

Delivered to each employee-participant was a certificate of beneficial interest certifying that a policy of given number and in a given amount had been delivered to Trustee for his benefit "under all of the terms and conditions of that certain Pension Trust Agreement entered into as of November 1, 1948, by and between the said Trustee and Texas Bankers' Association, as the same may hereafter be amended."

The Life Insurance Commissioner having theretofore in a letter addressed to Great Southern expressed the tentative opinion that the policies issued under the Bankers Association plan were in violation of Article 4764a, V.A.S.,—the group insurance law—, the Board by an order entered on May 4, 1949, found that the tentative opinion of the Life Insurance Commissioner was correct and declined to refer the matter to the Attorney General for an opinion. After Great Southern learned that the validity of the policies was being questioned by the Commissioner it declined to write or issue policies on any new employees.

This suit was instituted by Trustee against Great Southern and the Board, Trustee seeking in its suit a declaratory judgment defining its powers, responsibilities, duties and liability in its purchase of the insurance policies, and, more particularly, that the applicability of Article 4764a, V.A.S., to the trust agreement and the letter of commitment, both attached as exhibits to the petition, be declared and the validity of the instruments be determined. Association intervened in the suit and adopted the pleadings of Trustee. Great Southern by its answer asserted "that the arrangement and agreement and policies issued by it" in no wise constituted group insurance within the meaning of Article 4764a. The trial court held that the policies of insurance issued to employees of banks having less than 25 employees were issued in violation of Article 4764a and were invalid but that the policies issued to employees of banks having more than 25 employees were valid. All parties were dissatisfied with the judgment of the trial court and appealed. The Court of Civil Appeals held that none of the policies was issued in violation of Article 4764a and reversed the judgment of the trial court on this phase of the case. 232 S.W. 2d 163.

It is the position of the Board—petitioner here—that Article 4764a applies to all of the policies of insurance issued and delivered to Trustee; and it is the position of respondents that Article 4764a applies to none of such policies. In the event this Court should hold Article 4764a applicable to the policies involved, it is then the position of respondents that the article is unconstitutional and that there is no valid law regulating the writing of group life insurance.

Article 4764a is quite long. The article is divided into five sections and those sections pertinent to the inquiry here may be summarized as follows: Section 1 is headed "Group Life Insurance Definition" and provides that "no policy of group life

insurance shall be delivered in this state unless it conforms to one of the following descriptions:" "1. A policy issued to an employer, or to the trustees of a fund established by an employer, which employer or trustees shall be deemed the policyholder, to insure employees of the employer for the benefit of persons other than the employer." 2. A policy issued to a labor union to insure the members of the union who are actively engaged in the same occupation. 3. A policy issued to independent school districts, state colleges and universities, state departments, and associations of state and county employees. 4. A policy issued to a creditor to insure debtors of the creditor.

If the policy be one issued to an employer or to a trustee for an employer to insure the employees of the employer, all employees or all of any class of employees determined by conditions pertaining to their employment are mandatorily eligible; the premium is required to be paid by the employer either wholly from his own funds, in which event the policy must insure all insurable eligible employees, or from funds jointly contributed by the employer and his employees, in which event at least 75% of the insurable employees must contribute and participate; no policy may be issued on which the entire premium is to be derived from funds contributed by the employees; the amounts of insurance under the policy "must be based upon a plan precluding individual selection either by the employees or by the employer or trustee", and the amount of insurance on any employee is limited. The policy must cover at least 25 employees at date of issue.

Section 2 of the article is entitled "Group Life Insurance Standard Provisions." It is there provided that no policy of group life insurance shall be issued or delivered in this state until the form thereof has been approved by Board and that no such policy shall be issued and delivered unless it contains certain stipulated provisions, or provisions which in the opinion of the Board "are more favorable to the persons insured, or at least as favorable to the persons insured and more favorable to the policyholder." It is further declared that "the standard provisions required for individual life insurance policies shall not apply to group life insurance policies."

Section 4 is headed "Group policies unlawful except as authorized" and reads: "Except as provided in this Act, it shall be unlawful to make a contract of life insurance covering a group in this state, and the license to do business in Texas of any company making a contract of life insurance covering a

group in this state except as may be provided in this act may be forfeited by a suit brought for that purpose by the Attorney General at the request of the Board of Insurance Commissioners."

The employees for whose benefit the retirement plan and system was conceived and upon whose lives the policies of insurance were issued by Great Southern were not employees of Bankers Association but were employees of the participating banks holding membership in the Association. Bankers Association is a trade association and group insurance on the lives of the employees of participating banks could not be effected through such association or through a trustee appointed by it because it did not come within one of the four categories or agencies made eligible by Section 1 of Article 4764a. For that matter, respondents confess that a policy of group life insurance insuring the lives of employees of member banks could not, under the statute, be issued or delivered to Association or its trustee. They contend, however, that the provision in Section 4 for forfeiture of license to do business makes the statute penal in nature requiring that it be strictly construed; that it was the purpose of Article 4764a to regulate only the form of policy to be used in writing group life insurance; that under a strict construction the words "no policy", "the policy", "the group policy" and similar words appearing throughout the statute can only be interpreted to mean a single or master policy, and that group insurance is effected only in instances in which the insurer issues a master policy to the employer or other eligible agency; that Great Southern has issued no master policy but on the contrary has issued and delivered to the trustee its several individual ordinary life insurance policies each of which in itself constituted the entire contract between Great Southern and the person insured in keeping with the requirement of Article 5050, R.C.S., 1925, and each of which complies in all respects with the requirements of Article 4732 and 4733, R.C.S., governing life insurance policies. It is the further contention of respondents that since the policies comply with Article 4732 and 4733 the Court may not look to nor consider the terms and provisions of the trust agreement or the letter of commitment for the purpose of determining the nature and validity of the policies.

■ We do not agree that the provision for forfeiture of license to do business in Texas contained in Section 4 of the act requires in this proceeding such a strict construction of Article 4764a as should deter us from undertaking to arrive at the legislative intent and purpose in the enactment of the statute or

in giving effect to that intent and purpose. The cardinal rule in statutory interpretation and construction is to seek out the legislative intent from a general view of the enactment as a whole, and, once the intent has been ascertained, to construe the statute so as to give effect to the purpose of the legislature. A reading of Article 4764a shows that the act is primarily and essentially remedial in its nature. As early as 1909 the legislature recognized that the writing of life insurance was a business affected with a public interest and subject, therefore, to regulation to prevent abuses and discrimination. It was in that year that Articles 4732, 4733 and 5050 of our present statutes governing the form and contents of individual life insurance policies were adopted. In 1931 the legislature felt impelled to regulate the writing of group life insurance. This it did by the enactment of Senate Bill 41—now Article 4764a, V.A.S.—and by the emergency clause of that bill declared that a necessity existed "for a law defining and regulating this class of insurance." A law introducing a new regulation for the advancement of the public welfare or conducive to the public good is a remedial statute and should be liberally construed to effect its purpose. 50 American. Jur., p. 420, sec. 395; 59 C.J., p. 1107, sec. 657. The provision for forfeiture of license to do business was added to Article 4764a by amendment in 1947. Actually the amendment added nothing to the law. Under the provisions of Articles 4690 and 4691 the Board already had authority to institute suit for the forfeiture of licenses of insurance compaines violating or failing to comply with any of the insurance statutes. Surely it would not be contended that all of the articles of our statutes seeking to protect the public against abuses and discrimination in the field of insurance should be strictly construed. The most that can be said in favor of respondents' position is that the article is both remedial and penal. "Where a statute is both penal and remedial, as where it is penal in one part and remedial in another part, it should be considered as a penal statute when it is sought to enforce the penalty, and as a remedial statute when it is sought to enforce the remedy." 59 C.J., p. 1121, sec. 662. See also 50 Amer. Jur. p. 444, sec. 423. In this proceeding there is no effort made to invoke the penal provision of the statute and the rule of liberal construction must prevail. Liberally construed, Article 4764a does more than simply regulate the form of group life insurance policies.

■ We do not agree with respondents that we may look alone to the provisions of the individual policies to determine the nature of the insurance involved or the validity of the policies. These policies do not contain the entire contract between the parties

as is required of individual life insurance policies by Article 5050. The "control" endorsement attached to the policies specifically provides that many of the important rights vouchsafed to the to the individual employee "shall belong and be available without the consent of any other person" to Trustee "under all the terms and conditions of that certain pension trust agreement" heretofore described. This endorsement in itself requires a consideration of the trust agreement to determine the nature of the insurance. Furthermore, parties cannot be permitted to circumvent the plain provisions of the law by disseminating various phases and elements of their true contractual relationship into several separate written instruments. To hold otherwise would be to permit the parties to nullify the statute and destroy its purpose. This Court recently refused a writ of error in the case of Butler et al v. American Nat. Ins. Co., 235 S.W. 2d 185, a case strongly analogous on the facts, in which the Austin Court of Civil Appeals analyzed a number of independent contracts to conclude that the interested parties were writing a type of insurance prohibited by law. It is admitted that the pension trust plan could not operate effectively without the insurance feature. The insurance feature could not be put into effect without a company willing to underwrite it. The every foundation of the retirement plan is the agreement between Great Southern and Association evidenced by the letter of commitment and the acceptance of its terms. Even then the transaction was not complete. It was necessary that policies of insurance be issued and delivered to the trustee and that certificates of beneficial interest be issued and delivered to the participating employees. All of the instruments were a necessary part of the same transaction, without any one of which the transaction was not complete. It is a generally accepted rule of contracts that "where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together although they do not expressly refer to each other." 17 C.J.S., p. 714, sec. 298. The rule is followed by the courts of this state. Miles v. Briggs et al, 18 S.W. 2d 850 (writ dism.) ; Veal et al v. Thomason, 138 Texas 341, 159 S.W. 2d 472; 10 Tex. Jur., p. 286, sec. 166. This question in all of its substantial aspects was decided contrary to respondents' contention in the cases of Wann v. Metropolitan Life Ins. Co., 41 S.W. 2d 50 (Com. App.) and Metropolitan Life Ins. Co. v. Worton, 70 S.W. 2d 216 (writ refused). In those cases it was held that neither a group master policy alone nor a certificate of beneficial interest alone constituted the entire contract but that each was a part of the contract between the insurer and the insured. See also Carruth v. Aetna Life Ins. Co., 157 Ga. 608,

122 S.E. 226 and Seavers v. Metropolitan Life Ins. Co., 132 Misc. Rep. 719, 230 N.Y.S. 366.

Having concluded that all of the instruments involved in the transaction may be considered in determining the nature of the contract between the parties and that we are not limited by the rule of strict construction in our interpretation of Article 4764a, we now determine whether the insurance policies issued by Great Southern were, in fact, group insurance within the meaning of Article 4764a.

Section 1 of Article 4764a, although it speaks of "a policy" and undoubtedly applies as well to group insurance effected through a master policy, sets out the indicia of group insurance. In the series of instruments—the trust agreement, the letter of commitment, the letter of acceptance, the policies of insurance with "control" endorsement attached, and the certificates of beneficial interest—embracing the entire contractual relationship of the parties may be found most of the statutory indicia said by the legislature to be inherent in a contract of group insurance issued to an employer or to the trustees of a fund established by an employer. The statute provides that the employer or the trustee shall be deemed the policyholder. Here the trustee, although appointed by the Association, was the owner and holder of the policies. The statute requires that the policy insure the lives of the employees of the employer for the benefit of persons other than the employer. Here the policies insured the lives of the employees of the various participating banks for the benefit of persons other than the employers. The statute requires that all employees or all of any class of employees determined by conditions pertaining to their employment be eligible. Here Great Southern agreed to accept, without selection, all employees under 60 years and 6 months of age. The statute requires that the premium be paid by the employer either wholly from his own funds, in which event the policy must insure all insurable eligible employees, or from funds jointly contributed by the employer and his employees, in which event at least 75% of the insurable employees must contribute and participate. Here the employer was required to pay the premium either wholly from his own funds, in which event all employees were required to participate, or from funds jointly contributed by the employer and his employees in which event 80% of the employees were required to participate. The statute provides that no policy may be issued where the entire premium is paid by the employees. Here the employees were precluded from paying the entire contribution. The statute requires that the amount of in-

surance be based on a plan precluding individual selection either by the employees or by the employer or trustee. Here the plan provided amounts of insurance which precluded individual selection by the employees against Great Southern.

The real point of departure from the requirements of the statute is that whereas the statute prohibits the writing of group insurance for employers with fewer than 25 employees an effort is here made through a trade association to write group insurance for a number of employers with fewer than 25 employees.

That the insurance here involved is in fact group insurance we have no doubt. The parties themselves recognized that they were invading the field of group insurance. A member of the pension trust committee, a lawyer by education, testified that in setting up the plan the committee had considered group insurance and "sought to side-step it, or attempted to." Mr. Hand, the Pension Trust Consultant, sent out a brochure to banks in which he referred to the plan as a "group underwriting commitment" and expressed the hope that "a group underwriting commitment" might be obtained for banks which deferred entrance into the plan until 1949.

Inherent in most, if not all, ventures of group underwriting of life insurance is the willingness of the insurer, being first assured of a sufficient spread of risks to enable it to secure a reasonable cross section of normally healthy lives, to make concessions it would not make to the individual applicant for insurance. The volume of business and the consequent minimizing of expense will justify the concessions. Usually the major concession is the waiver of the insurer's right to require evidence of insurability. That was the concession made here by Great Southern. The test here then is this: Would Great Southern have been willing to place in effect, without evidence of insurability, and continue in force the so-called policies of ordinary life insurance if it had not been assured of a spread of risks among a group. The record here commands a negative answer. Great Southern did not submit an underwriting bid until it had made a study of the actuarial data on the employees of 100 banks. Before placing the policies in effect it assured itself of a spread of risks by requiring participation by at least 80% of the employees of each bank, by providing that no insurance was to go into effect until at least 500 applications or applications for $1,000,000 in insurance were received and by providing that all policies were to become effective at the same

time. It was assured of the continuance of the spread of risks by the trust agreement provisions requiring participation by all those subsequently employed by the participating banks and imposing on Trustee the duty to pay premiums for the entire group, thereby preventing lapsations by individual participants. It was the assurance of a sufficient spread of risks among the group that induced Great Southern to waive its right to require evidence of insurability contrary to its policy of reserving that right in passing on applications of individual applicants.

Respondents attack the constitutionality of Article 4764a primarily on the ground that the classes made beneficiaries of the act are arbitrary. It is contended that there is no reasonable basis for permitting the writing of group insurance covering 25 or more employees and prohibiting the writing of such insurance covering a group of less than 25 persons. It is further contended that there is no reasonable basis for permitting the issuance of group insurance to a labor union to insure the members of such union who are engaged in the same occupation and prohibiting the issuance of such insurance to a trade association to insure the employees of its members.

■ In determining the questions presented it is well to bear in mind a few of the rules, long since established by the courts of this state, by which we must be guided. It will be presumed that classifications made by the legislature are reasonable and one challenging the reasonableness thereof must assume the burden of clearly establishing the arbitrary nature of the classifications. Supreme Lodge United Benev. Ass'n. v. Johnson, 98 Texas 1, 81 S.W. 18; Watts et al v. Mann et al., 187 S.W. 2d 917,924 (writ refused); Auto Transit Co. et al v. City of Ft. Worth et al, 182 S.W. 685,691 (writ refused). If there exists a reasonable basis for the classifications made, the validity of the law will be upheld. Friedman v. American Surety Co. of New York et al, 137 Texas 149, 151 S.W. 2d 570; Heath v. Lewis et al, 32 S.W. 2d 249 (writ refused); Gerard et al v. Smith et al, 52 S.W. 2d 347 (writ refused).

■ Legislation regulating the writing of life insurance is in the public interest. It safeguards the rights of the policyholder not alone by prescribing the form and contents of his policy but by undertaking as well to insure the solvency of the company with which he contracts. According to respondents' own witness, A. F. Mitchell, sound group underwriting, particularly where the iusurer waives evidence of insurability, requires that there be a sufficient number of persons in the group to assure a normal

complement of healthy lives to counterbalance the number of impaired lives that will appear in the group. In order to prevent insurers from taking undue risks by insuring smaller groups in which most, if not all, the lives might be impaired the legislature has set the minimum number of lives in the group to be insured at 25. It may be that the solvency of insurance companies would have been better protected if the number had been set at 30, or as well protected if the number had been set at 24, but the line had to be drawn and it was the province of the legislature to draw it. As was said by this Court in the case of Clark v. Finley, 93 Texas 171, 54 S.W. 343, "Exact equality in such matters, however desirable, is practically unattainable." The provision of Article 4764a requiring that group insurance be written only for groups of 25 or more persons is not arbitrary.

■ Nor do we believe that the inclusion of labor unions and their members as beneficiaries of the act and the exclusion of trade associations was so arbitrary as to render the act unconstitutional. The members of a labor union have with their union a close relationship and an affinity of interests that does not necessarily exist in a trade association, a more loosely knit type of organization. It is a matter of common knowledge that the bond that ties the laborer to his union is sometimes much stronger than that which ties him to his employer. Not so with the trade association. One of the purposes of the legislature in limiting the types of agencies eligible to procure insurance for a group of persons may well and reasonably have been to make certain that the agency purchasing the insurance bore such a close relationship and kinship of interests with the individual insureds that the agency could and would know the insurance needs of the individuals in the group and would use his money (if he contributed) to see that those needs were served. A classification having some reasonable basis does not offend against that clause (the equal protection clause of the Fourteenth Amendment of the United States Constitution) merely because it is not made with mathematical nicety or because in practice it results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369. If trade associations were included in the act no doubt some other group agency could feel aggrieved, with equally good reasons, because it had not also been included. We are not to be understood as saying that trade associations could not be included in the act as an agency eligible to purchase group insurance. They have been included as eligible agencies in group insurance laws enacted in many of the states. That they might properly have

been included as an eligible agency does not, however, subject the act to valid constitutional objection. "The equal protection clause does not require that state laws shall cover the entire field of proper legislation in a single enactment." Middleton v. Texas Power & Light Co., 249 U.S. 152, 39 Sup. Ct. 227, 63 L. Ed. 527. The question of whether trade associations may properly be included as beneficiaries under the Act is not before us. We hold only that Article 4764a of our statutes is not unconstitutional because of their exclusion.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is reformed so as to declare invalid as prohibited by Article 4764a all policies of insurance issued by Great Southern under its agreement with Trustee.

Opinion delivered May 2, 1951.

### ON REHEARING

MR. JUSTICE CALVERT delivered the opinion of the Court.

In the last paragraph of our opinion on original submission we declared "invalid" all policies of insurance issued by Great Southern under its agreement with Trustee. The language there used is subject to the criticism now urged that to declare these policies "invalid" would be to destroy the rights of those protected by the policies contrary to the rule established by the decision of this court in the case of American National Insurance Company v. Tabor, 111 Texas 155, 230 S.W. 397. We had no intention of abandoning the rule there announced. Accordingly, the last paragraph of the opinion is rewritten so as to read as follows:

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is reformed so as to declare that all policies of insurance issued by Great Southern under its agreement with Trustee are issued in violation of Article 4764a.

The motions for rehearing have been carefully examined and except as above indicatetd they are overruled.

Opinion delivered June 13, 1951.