**NATIONAL EMPIRE LIFE INSURANCE COMPANY, Appellant,**

v.

**FIRST NATIONAL BANK IN LOCKNEY, Appellee.**

**No. 7263.**

Court of Civil Appeals of Texas.

Amarillo.

May 27, 1963.

Rehearing Denied Oct. 21, 1963.

Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, for appellant.

Ben P. Ayres, Floydada, G. W. Suggs, Lockney, for appellee.

CHAPMAN, Justice.

Group Credit Life Insurance governed by Article 3.50 of Texas Insurance Code, Vernon's Ann. Texas Civ.St. constitutes the statutory subject matter of this suit.

Upon a trial to the court judgment was rendered for First National Bank in Lockney against National Empire Life Insurance Company upon two Group Credit Life insurance certificates in the total face amount of $10,000 representing insurance purchased by the creditor bank upon the life of M. R. Moran, one of the bank's debtors in the credit group to whom loans or loan commitments had been made for those with seasonal incomes engaged in general agricultural or horticultural operations under the provisions of Subsection (4) of Section 1 of Article 3.50, Insurance Code. No findings or conclusions were requested or filed.

On May 14, 1959, Columbia General Life Insurance Company, hereinafter called Columbia, (later merged into appellant Company), issued to appellee, as policyholder and beneficiary thereof, Group Policy No. 2050, by the terms of which it agreed to insure the lives of such debtors as appellee might thereafter from time to time designate and to pay to appellee the proceeds of such insurance upon due proof of death of any debtor so insured. M. R. Moran was one of those designated in the group and had been a recipient of agricultural and horticultural loans from appellee bank for many years.

On February 8, 1961, M. R. Moran applied for and was granted a loan commitment by appellee bank in the amount of $10,000 upon agreement he would repay such loan and for repayment of which he was to be personally liable. That commitment remained in effect until his death on August 24, 1961.

On April 4, 1961, Moran being then indebted to appellee in excess of $5,000, appellee forwarded to Columbia a certificate of insurance dated that day designating Moran as a debtor for insurance upon his life in the amount of $5,000 under such group policy and paid the premium prescribed by the policy. Moran having obtained further advances from that date to August 24, 1961, appellee on May 21, 1961, forwarded another certificate of insurance in the amount of $5,000 designating him as the debtor for insurance upon his life and paying the premiums required. It continued advancements until the loans to him exceeded $10,000. All certificates and premiums were accepted and retained by Columbia, though the amount of the premiums were tendered back to appellee by appellant during the trial.

Appellant based its defense upon two contentions. The first was that appellee suppressed material facts concerning the physical condition of Moran, in that he was, prior to and at the time of issuance of the certificates, afflicted with inoperable cancer, which facts were or should have been well known by the bank and which facts, appellee, as agent of appellant under the group policy was under duty to report.

In the first place appellant has, in its brief, proceeded upon a premise unsupported in the record in that it takes the position that Neill and Minor, vice-presidents of the bank during the times involved in the controversy, knew of Moran's terminal cancer long before the issuance of the certificates of insurance in question. These facts the officers vehemently denied. Neill testified he did not learn that Moran was supposed to have cancer until after his death. "I first learned that he died of a heart attack and then later and I don't recall who it was now, someone told me he had cancer." In reply to cross examination by counsel for appellant of Mr. Neill's answers in his deposition, which appeared to be contrary to his testimony, he replied in effect that counsel for appellant made such statements and that he did not want to sign the deposition, "because I didn't say that." Under the record made here we believe it requires no citation of authority to say the court as the fact-finding body had the authority to accept or reject the deposition testimony that was contrary to the positive testimony given in the trial of the case. Particularly is this true in view of the fact that at the time the testimony was given Mr. Neill had no interest in or connection with the bank and could have had

no selfish reason for the testimony he gave.

Mr. Minor, vice-president of appellee bank from 1958 down to and including the time of trial, testified that at the time of the issuance of the two certificates he had heard nothing of Moran having cancer and that so far as he could recall he first heard it at about the time of his death.

■ Where no findings of fact or conclusions of law have been requested or filed in a case tried to the court, we must test the validity of the trial court's judgment on the assumption that the trial court found every disputed fact in such way as to support the judgment rendered. Construction & General Labor Union, Local No. 688 v. Stephenson, 148 Tex. 434, 225 S.W.2d 958.

Additionally, the Group Policy contained no reference to insurability or proof of insurability except in the following paragraph:

"INCONTESTABILITY. The validity of this Group Policy shall not be contested, except for nonpayment of premiums, after it has been in force for two (2) years from its date of issue; and no statement made by any Debtor insured under this Group Policy relating to his insurability shall be used in contesting the validity of the insurance with respect to which such statement was made after such insurance has been in force prior to the contest for a period of two years during such Debtor's lifetime, nor unless it is contained in a written instrument signed by him."

Apposite to the lack of insurability requirements in our case is the statement by the Supreme Court of Texas in Board of Ins. Com'rs. v. Great Southern Life Ins. Co., 150 Tex. 258, 239 S.W.2d 803, wherein the Court said:

"Inherent in most, if not all, ventures of group underwriting of life insurance is the willingness of the insurer, being first assured of a sufficient spread of risks to enable it to secure a reasonable cross section of normally healthy lives, to make concessions it would not make to the individual applicant for insurance. The volume of business and the consequent minimizing of expense will justify the concessions. *Usually the major concession is the waiver of the insurer's right to require evidence of insurability.*" (All emphases herein are ours unless otherwise designated.)

Section 2 of Article 3.50 of the Insurance Code provides in part:

"No policy of group life insurance shall be issued or delivered in this State unless and until a copy of the form thereof has been filed with the Board of Insurance Commissioners of the State of Texas and formally approved by such Board, nor shall any policy of group life insurance be delivered in this State unless it contains in substance the following provisions, or *provisions which in the opinion of the Commissioner are more favorable to the persons insured, or at least as favorable to the persons insured and more favorable to the policyholder, * * *.*"

Following the provisions of the Article and Section of the Insurance Code just quoted the statute contains a number of enumerated standard provisions of Group Life Insurance, among which is Subdivision (4) providing:

"A provision setting forth the conditions, *if any,* under which the insurer reserves the right to require a person eligible for insurance to furnish evidence of individual insurability satisfactory to the insurer as a condition to part or all of his coverage."

Additionally still is the following provision in the Group Policy sued upon:

"ENTIRE CONTRACT. This Policy and the application of the Creditor, a copy of which is attached, shall con-

stitute the entire contract. All statements made by the Creditor or by the insured Debtor shall be deemed representations and not warranties, and no statement is or has been furnished to the Debtor or to his beneficiary."

The record is silent as to any statement of insurability made either by appellee or the debtor as to the latter's physical condition or insurability. We, therefore, hold such requirement was waived and appellant's point one is without merit.

In its second point appellant contends that the certificates of insurance having been issued at other and different times than the creditor beneficiary bank made loans to the debtor, both the Group Policy contract and the Group Credit Life Statutes of Texas were violated by such certificates and did not create any valid insurance contract.

The initial statement of Article 3.50, Insurance Code, "Group Life Insurance", says: "No policy of group life insurance shall be delivered in this state unless it conforms to one of the following descriptions."

Among the descriptions which follow is Subsection (4). That part of Subsection (4) applicable to the instant case and germane to appellant's second point provides:

"(4) A policy issued to a creditor, who shall be deemed the policyholder, to insure debtors of the creditor, subject to the following requirements:

"(a) The debtors eligible for insurance under the policy shall all be members of a group of persons numbering not less than fifty (50) at all times, who became borrowers * * * under agreement to repay the sum borrowed * * * or the face amount of any loan or *loan commitment, totally or partially executed, made to a debtor with seasonal income by a creditor in good faith for general agricultural or horticultural purposes, secured or un-*secured, where the debtor becomes personally liable for the payment of such loan,* but not to exceed Ten Thousand Dollars ($10,000.00) on any one life. * * *

"(d) The insurance shall be payable to the policyholder. Such payment shall reduce or extinguish the unpaid indebtedness of the debtor to the extent of such payment; provided that in the case of a debtor with seasonal income, under a loan or *loan commitment for general agricultural or horticultural purposes of the type described in paragraph (a),* the insurance in excess of the indebtedness to the creditor, if any shall be payable to the estate of the debtor or under the provision of a facility of payment clause."

Appellee's vice-president Carroll Minor, detailed in his testimony the practices of the bank in making loans of the nature contemplated by Subsection (4) of Section 1 just quoted. Without quoting such testimony verbatim here, it was to the effect that farmers come into the bank early in the year to make arrangements for the financing of their agricultural operations for that particular year; that the bank makes loan commitments for the amount of financing they will furnish and usually take chattel mortgages on the borrower's farm machinery and the crops to be grown that year; they have from 150 to 200 agricultural borrowers each year; if the farmer is an old established borrower the loan officer usually initiates the first disbursement but if he is a new customer it must be approved by the loan and discount committee; the bank enters into a committed amount with the borrower, which amount is stipulated in writing on the application for loan; the bank considers the commitment very binding; a portion of the amount of the loan is usually disbursed at the time the application is approved, then various amounts are disbursed as the need arises and a note is made at the time of disbursement; the chattel mortgages used to secure the pay-

ment of the notes have an after-incurring indebtedness clause in them.

Specifically as to Mr. Moran, the testimony shows he was an agricultural borrower with a seasonal income and had been ever since Mr. Minor's connection with the bank beginning in 1958; his application for approval of a loan for $10,000 for 1961 was approved on February 8, that year and he received initially $2,000 upon the commitment. He continued to receive advancements through the year until the total exceeded $10,000.

On April 4, 1961, at a time when advancements to Moran had been made by the bank in the total sum of $5,250, ($1,250 of which was a balance on a note for farm machinery carried over from 1960, due in 1961, and which was not regarded by appellee as within the loan commitment), appellee forwarded to appellant a certificate of insurance dated April 4, 1961, upon Moran in the amount of $5,000; on May 21, 1961, when advancements by the bank to Moran totaled $8,505.48 a second certificate in the amount of $5,000 was forwarded; at the time of his death on August 24, 1961, he was indebted to appellee in the total sum of $11,505.48, including the $1,250 equipment loan; premiums were paid on both certificates and retained by Columbia; Moran had been similarly insured by two certificates in the same amount in 1960; the same practice generally was followed with other agricultural borrowers as was followed with Moran in 1961.

Article 4764a (Article 3.50, Insurance Code) before 1955 did not contain Subsection (4) with respect to *loan commitments* made to those with seasonal income pursuing agricultural or horticultural activities within the statutory authority of Group Policy Insurance. Acts 1955 of the 54th Legislature, Senate Bill 369, Chapter 247 added that amendment and in the enacting clause stated it was for the purpose of allowing "insurance of the face amount of a loan or *loan commitment made to a debtor with* *seasonal income for general agricultural or horticultural purposes; * * *.*"

The Group Policy in question under "Errors or Omissions" provides it is "mutually understood and agreed that while this Group Policy remains in force no errors or intentional omissions by the Creditor or company shall deprive any eligible Debtor of insurance, nor secure for any Debtor insurance, except in accordance with the insurance schedule, * * *"

Under "Reports" the policy provides: "The Creditor shall, *upon request of the Company*, furnish the Company with the names of all Debtors initially insured and the amount of their respective indebtedness and likewise of all Debtors subsequently insured hereunder."

The "Eligibility" clause provides each debtor of the creditor shall automatically become insured from the first day, on or after the effective date of the Group Policy, on which he is indebted to the creditor.

The "Insurance Schedule" provides:

"Each Debtor shall be insured at any time for the amount necessary to then discharge the Debtor's indebtedness to the Creditor of the classes specified in the Application, but not exceeding $10,000.

"It is agreed that particulars required by the Company concerning Debtors proposed to be covered immediately or in the future, and Debtors whose coverage is to be changed or cancelled, shall be furnished monthly to the Company on forms provided by it."

█ We believe the record here made would require us to hold that appellant in maintaining for almost three years prior to this controversy a Group Policy with appellee, whom the evidence shows is primarily an agricultural lending bank, was obligated by the lending operations on loan commitments with the debtors practiced by the bank and provided for in the Policy, and

that they also contracted with reference to notices or reports to the company.

The record is void of any form of report ever required of appellee bank as to coverage of debtors except the certificates of insurance introduced into evidence.

If these provisions appear in conflict with other provisions of the policy, then "* * * this is an appropriate case for the application of the rule that ambiguous terms of an insurance policy should be construed in favor of the insured where they are reasonably susceptible of such a construction." Lloyds Casualty Insurer v. McCrary, 149 Tex. 172, 229 S.W.2d 605 and cases there cited on the point. See also Standard Life & Accident Insurance Co. v. Hardee, Tex. Civ.App., 330 S.W.2d 544 (NRE). We believe they are reasonably susceptible of such construction in this case. Accordingly, the judgment of the trial court is in all things affirmed.