Frank J. MONTAVON and Wife Hermelinda Montavon, Appellants,

v.

The ALAMO NATIONAL BANK OF SAN ANTONIO, Appellee.

No. 15710.

Court of Civil Appeals of Texas, San Antonio.

July 13, 1977.

P. Keith O'Gorman, San Antonio, for appellants.

John D. Fisch, C. M. Montgomery, San Antonio, for appellee.

KLINGEMAN, Justice.

This is a suit by Frank J. Montavon and wife, Hermelinda Montavon, against The Alamo National Bank of San Antonio, herein called Bank, for wrongful conversion of two Certificates of Deposit owned by the Montavons which Certificates of Deposit were delivered to the Bank in connection with an investment agreement with Fipco, Inc., under which the Montavons agreed to support a $25,000 line of credit at the Bank.

The Montavons went to the Bank, executed an "Owner's Consent to Pledge" and "Security Agreement—Pledge," endorsed the two Certificates in blank and delivered the Certificates to the Bank. The Bank thereafter made advances of $25,000 to Fipco, and Fipco executed and delivered notes for such amount. Ultimately, Fipco defaulted in the payment of this debt to the Bank. After some efforts were made to collect the obligation, the Bank applied the proceeds of the two Certificates of Deposit to Fipco's debt. Suit was brought by the Montavons against the Bank seeking actual damages in the amount of $25,000, the face value of the two Certificates of Deposit, and exemplary damages in the amount of $10,000. The Bank's motion for summary judgment was granted, and judgment entered that the Montavons take nothing.

A chronological summary of the background of this case is as follows:

October 1972: Montavon first became acquainted with Fipco.

October—November, 1972: Montavon bought $11,250 of Fipco's stock and agreed to support a $25,000 line of credit to Fipco.

November 21, 1972: The Montavons executed the Owner's Consent to Pledge and a Security Agreement—Pledge to the Bank as secured party. Both of these instruments describe the two Certificates of Deposit. At this time, the Montavons also signed the backs of the two Certificates of Deposit and delivered them to the Bank.

November 22, 1972: $15,000 advance was made to Fipco by the Bank.

December 19, 1972: $10,000 advance was made to Fipco by the Bank. Notes were made by Fipco to the Bank for such advances and were periodically renewed thereafter.

October 30, 1974: New documents (an Owner's Consent to Pledge and Security Agreement—Pledge) basically similar to the original were executed by the Montavons.

August 1975: A meeting was held between Montavon, Voyles, an officer of the Bank, and Langholz, an officer of Fipco, and documents were drawn up which were never executed.

September 1975: Montavon says that he was informed by the Bank that the Certificates of Deposit were security for Fipco's loan.

September 18, 1975: Montavon wrote to the Bank attempting to revoke the Consent to Pledge.

October 10, 1975: The Bank wrote the Montavons stating that the Certificates of Deposit were being applied against the Fipco debt.

October 31, 1975: The Montavons sued the Bank.

Pertinent written instruments here involved may be summarized as follows:

(a) November 21, 1971—Owner's Consent to Pledge. This instrument is signed by the Montavons and states that for the purpose of enabling Fipco to obtain credit, the Montavons authorized Fipco to hypothecate, pledge and deliver to the Bank the two Certificates of Deposit which are specifically described therein, and the Montavons agree that when so hypothecated, pledged and delivered, the collateral (the two Certificates of Deposit) shall secure all liabilities of debtor to the Bank.

(b) Security Agreement—Pledge. The Montavons, "debtor", granted to the Bank, "secured party", a security interest in the two Certificates of Deposit, specifically described therein, to secure performance and payment of all obligations and indebtedness of debtor to secured party of whatsoever kind and whenever or however created or incurred. This instrument is signed by the Montavons.

By two points of error the Montavons assert that the trial court erred in granting the Bank's motion for summary judgment because: (1) the pleadings, depositions and affidavits on file establish genuine issues as to material fact; and (2) Bank is not entitled to a summary judgment as a matter of law.

The Bank asserts that the trial court's judgment is correct because:

(1) The pleadings, depositions, exhibits, and affidavits on file establish that there is no genuine issue as to any material facts.

(2) The Bank is entitled to a summary judgment in its favor as a matter of law.

(3) The agreement between the parties established that the sole and only purpose of the transaction in question was to establish a line of credit for Fipco at the Bank to be secured by the Montavons' Certificates of Deposit, thereby creating an equitable lien in favor of the Bank as a matter of law.

(4) It is undisputed that the Montavons received the benefits of the transaction in question and are estopped to deny the validity and enforceability of a perfected security interest in favor of the Bank.

The summary judgment evidence consists of a number of depositions, an affidavit of Gilbert Langholz, president of Fipco, and numerous written instruments.

By affidavit, Langholz stated that he did not pledge the two Certificates of Deposit owned by the Montavons and that he did not discuss collateralization of Fipco's note with the Bank.

By deposition, Frank Montavon testified that he first became acquainted with Fipco about October 1972; that he had discussions with Langholz about becoming a stockholder in Fipco under which he was to buy 1,125 shares of stock at $10 a share, and support a line of credit for Fipco of $25,000; that he desired to allow Langholz to pledge or do what he needed with the Certificates of Deposit; and that when he deposited the $25,000 in the Bank, it was with an eye to using the money as a part of the Fipco deal. He further testified that at the time the Fipco deal was closed and $11,250 turned over to Fipco, he xeroxed the two Certificates of Deposit (one for $20,000 and one for $5,000) and gave one copy to Langholz, and that Langholz in his presence wrote on the bottom of the xeroxed copies that the Certificates of Deposit were "*pledged to the Alamo National Bank to support Fipco, Inc. line of credit.*" (Emphasis added) He stated that his agreement with Langholz was to deliver the Certificates of Deposit to the Bank for the purpose of making $25,000 available for Fipco; that pursuant thereto he went to the Bank on November 21, 1972 and saw Voyles, an officer of the Bank, who had previously talked to Langholz; that the Bank had prepared some documents which he read; that he signed such documents and also signed the backs of the two Certificates of Deposit and delivered them to the Bank. He also stated that he thought Fipco would have to pledge the two Certificates of Deposit before he would stand any risk of losing them.

Jerry Voyles testified by deposition that he was a vice-president of the Alamo National Bank, commercial loan division; that Langholz brought the Montavons in and informed him that the Montavons had two Certificates of Deposit and that they had agreed to support a $25,000 line of credit by pledging these Certificates of Deposit to secure a loan to Fipco; that the debt of Fipco was secured by the Owner's Consent to Pledge, the Security Agreement, and the endorsement and delivery of the Certificates of Deposit by the Montavons to the Bank; that pursuant thereto he made one advance to Fipco of $15,000 and another of $10,000; that Fipco's notes were renewed periodically.

Numerous written instruments were introduced into evidence including the Owner's Consent to Pledge, the Security Agreement—Pledge, and the applicable Certificates of Deposit.

The thrust of the Montavons' contentions is that they executed a Consent to Pledge Agreement for the purpose of enabling Fipco to obtain credit on the two Certificates of Deposit which authorized Fipco to pledge such Certificates of Deposit, and provided that when such Certificates of Deposit were so hypothecated, pledged and delivered, such Certificates of Deposit would be collateral to secure all liabilities of Fipco to the Bank; that Fipco never hypothecated or pledged such Certificates of Deposit; and, therefore, the Bank's act of applying the proceeds of such Certificates of Deposit to Fipco's debt was a wrongful conversion of their property. Secondly, they assert that the Security Agreement—Pledge is irrelevant to this law suit because no debt of the Montavons is at issue.

■ We have concluded, under the summary judgment evidence in the records before us, that as a matter of law, the Bank acquired and perfected a valid and enforceable security interest in the Certificates of Deposit herein involved as security for Fipco's debt, and that the Bank was not guilty of conversion in applying the proceeds of the Certificates of Deposit on Fipco's debt. Tex.Bus. & Comm.Code Ann. art. 9.105(a)(4), art. 9.105(a)(12), art. 9.102, art. 9.203(a) and (b), art. 9.305, art. 1.201(3), art. 1.205(d); *First Nat'l Bk. in Grand Prairie v. Lone Star Life Ins. Co.,* 524 S.W.2d 525 (Tex.Civ.App.—Dallas), *writ ref'd n. r. e. per curiam,* 529 S.W.2d 67 (Tex.1975); *Southview Corp. v. Kleberg First National Bank,* 512 S.W.2d 817 (Tex.Civ.App.—Corpus Christi 1974, no writ).

It is undisputed that the Certificates of Deposit were delivered to the Bank for the purpose of securing a line of credit to Fipco by the Bank. Simultaneously, with the delivery of such Certificates of Deposit and, in connection therewith, the "Consent to Pledge" and "Security Agreement—Pledge" were executed and delivered by the Montavons to the Bank. These instruments should be read and construed together. *Board of Ins. Com'rs v. Great Southern Life Ins. Co.,* 150 Tex. 258, 239 S.W.2d 803, 809 (1951); *Adams v. Abbott,* 151 Tex. 601, 254 S.W.2d 78 (1952); *McLean v. Hillman,* 352 S.W.2d 310 (Tex.Civ.App.—Amarillo 1961, no writ).

Pertinent provisions of the Texas Business and Commerce Code are as follows:

Art. 9.305:

"A security interest in . . ., instruments, . . . may be perfected by the secured party's taking possession of the collateral."

Art. 9.304(a):

"A security interest in instruments . . can be perfected only by the secured party's taking possession, . . . ."

Art. 9.203(a):

". . . [A] security interest is not enforceable against the debtor or third parties unless (1) the collateral is in the possession of the secured party; or (2) the debtor has signed a security agreement which contains a description of the collateral . . . ."

Art. 9.105(a)(4):

" 'Debtor' means the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts, contract rights or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral in any provision of the chapter dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires."

9.105(a)(12):

" 'Security agreement' means an agreement which creates or provides for a security interest."

1.201(3):

" 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this title . . . ."

■ A Certificate of Deposit is an instrument in which a security interest can be perfected under the Business and Commerce Code. *First Nat'l Bk. in Grand Prairie v. Lone Star Life Ins. Co., supra; Southview Corp. v. Kleberg First National Bank, supra.*

In the case before us the requirements of a "security agreement" have been met under the provisions of the Texas Business and Commerce Code. The applicable statutes and authorities place great emphasis upon the delivery of possession of the collateral, and in the instant case the Certificates of Deposit were endorsed in bank by the Montavons and delivered to the Bank, and in connection therewith the Montavons executed the "Consent to Pledge" and "Security Agreement—Pledge", both of which instruments specifically described the collateral (two Certificates of Deposit). Such instruments, when read and construed together, created a valid and enforceable security interest in the Certificates of Deposit which were delivered to the Bank to secure the debt of the Montavons.

The trial court did not err in granting the summary judgment. In reaching this conclusion we are influenced by the facts that: (a) the obvious purpose of the delivery of the endorsed Certificates of Deposit to the Bank was to secure a line of credit for Fipco; (b) the Bank in reliance thereon advanced such credit to Fipco; (c) under the applicable provisions of the Texas Business and Commerce Code, the effect of the delivery of such Certificates, the executed Consent to Pledge, and Security Agreement—Pledge, was to perfect a valid security interest in the Bank to such Certificates of Deposit to secure Fipco's debt.

The summary judgment was properly granted by the trial court. The judgment is affirmed.