**Dale B. MENARD, Appellant,**

v.

**John N. MITCHELL and John Edgar Hoover.**

**No. 22530.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 21, 1969.

Decided June 19, 1970.

Mr. Noah Menard, Washington, D.C., for appellant.

Mr. Thomas C. Green, Asst. U.S. Atty., with whom Messrs. David G. Bress, U.S. Atty., at the time the brief was filed, and Joseph M. Hannon, Asst. U.S. Atty., were on the brief, for appellees. Messrs. John A. Terry and Julius A. Johnson, Asst. U.S. Attys., also entered appearances for appellees.

Before BAZELON, Chief Judge, and McGOWAN and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

This is a suit to compel the Attorney General and the Director of the Federal Bureau of Investigation to remove appellant's fingerprints and an accompanying notation regarding his detention by California police from the FBI's criminal identification files. According to his complaint, appellant was picked up without probable cause and held for two days by the Los Angeles police. Never accorded a judicial hearing on the legality of his detention, he was finally released when the police were "fully satisfied" that no basis existed for charging him with crime. Subsequently, the FBI obtained appellant's fingerprints and the additional information at issue, which it maintains in its criminal identification

files.[1] According to the complaint, the information retained is misleading and incomplete; and it will become available, to appellant's detriment, to law enforcement officers, potential employers, and other persons. Accordingly, appellant seeks to have it purged from the files.[2]

Both sides moved in the District Court for summary judgment; appellant's motion was denied, and appellees' was granted. On this appeal, the parties agree that the case was ripe for decision on the cross-motions for summary judgment; they differ only as to the proper outcome. For the reasons hereafter set forth, however, we believe that final decision should have awaited a more complete factual development.

Consequently, we remand the case for trial.[3]

## I.

In support of his motion for summary judgment, appellant did not rely upon the full breadth of his complaint. Instead, he reasoned as follows. Appellees admit that their files contain a card bearing appellant's fingerprints and a notation indicating that he had been picked up by the California police and released without formal charges being lodged against him. A California statute provides that, with exceptions not here relevant, such a procedure is proper only if the police are satisfied "that there is no ground for making a criminal complaint against the person arrested." [4] Subsequently, the incident

1. According to appellees' answers to interrogatories propounded by appellant, the files originally contained a card bearing appellant's name and fingerprints and the following notation:

    Date Arrested or Received—8–10–65
    Charge or Offense—459 PC Burglary
    Disposition or Sentence—8–12–65—Released—Unable to connect with any felony or misdemeanor at this time.
    Occupation—Student
    Residence of Person Fingerprinted—Saticoy & Canoga Canoga Park

    After the present complaint was filed, the entry under "Disposition or Sentence" was changed to read

    8–12–65—Released—Unable to connect with any felony or misdemeanor—in accordance with 849b(1)—not deemed an arrest but detention only.

    Surprisingly, according to appellees' answers the card appears to contain no indication of the source of the information or the state in which the incident took place.

2. Appellees have admitted that their files contain a record of appellant's detention; the contents of the file, as set forth in note 1 *supra*; and that they know of no crime committed by appellant or incident to his detention. The remaining allegations of appellant's complaint were denied, and have not been the subject of affidavits filed by either side in the case.

3. Language in appellees' brief could be read to suggest that, since the incident underlying the present suit took place in California, transfer of this litigation to a federal district court in that state might be appropriate. *See* 28 U.S.C. § 1404(a) (1964). Whatever might be the situation in other circumstances, the present record does not indicate that transfer would be appropriate. It appears that the only witnesses present when appellant was taken into custody were appellant and the two arresting officers. Although the officers are presumably still in California, appellant, who has the burden of proof, presently resides in Silver Spring, Maryland. Furthermore, also relevant at trial will be information regarding the practices of the FBI in disseminating its criminal identification records, *see* notes 33–36 *infra* and accompanying text, and witnesses regarding these matters would presumably be more accessible in the District of Columbia than in California. Appellant's choice of forum is itself entitled to some weight. And finally, it might well be thaat appellant, who appeared *pro se* in the District Court, would be unable to prosecute his suit were it transferred to the West Coast. *See generally* Van Dusen v. Barrack, 376 U.S. 612, 643–646, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) ; Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) (prior law; doctrine of *forum non conveniens*) ; 1 J. Moore, Federal Practice § 0.145(6) (2d ed. 1964).

4. Any peace officer may release from custody, instead of taking such person before a magistrate, any person arrested without a warrant whenever :

    (1) He is satisfied that there is no ground for making a criminal complaint

"shall not be deemed an arrest but a detention only." [5]  Appellant strenuously argues that the FBI has statutory authority to maintain in its criminal identification files only "criminal" records; that the material at issue cannot, in light of the California statute referred to, fairly be characterized as a "criminal" record; [6]  and that therefore it must be removed from the FBI's files. [7]

■■  Assuming that the FBI's statutory authority is limited as appellant suggests, [8] we do not believe that the facts established on the motion for summary judgment [9] are such as to bring the records of appellant's detention outside of a fair reading of the term "criminal records."  For we cannot say that Calif.Penal Code, § 849(b) (1), the provision relied upon, was intended to limit the substantial element of discretion normally exercised at the intake stages of the criminal process in deciding who, of the many persons who may be guilty of criminal activity, shall be formally charged and prosecuted. [10]  Release under § 849(b) (1) does not necessarily imply that investigation has exonerated the one arrested; it is proper if

(1) further investigation exonerated the arrested party, (2) the complainant withdrew the complaint, (3) further investigation appeared necessary before prosecution could be initiated, (4) the ascertainable evidence was insufficient to proceed further, (5) the admissible or adducible evidence was insufficient to proceed further, or (6) other appropriate [reasons]. [11]

Despite the statutory difference in denomination, [12] therefore, nothing estab-

against the person arrested.  Any record of such arrest shall include a record of the release hereunder and thereafter shall not be deemed an arrest but a detention only.
Calif.Penal Code, § 849(b) (1) (West Supp.1970).  A like procedure is proper if the arrest was only for intoxication, or if the arrest was for a misdemeanor and the person arrested has signed an agreement to appear in court at a designated time.  Id. § 849(b) (2), (3).

5.  Calif.Penal Code, § 849(b) (1) (West. Supp.1970).

6.  Cf. Wheeler v. Goodman, 306 F.Supp. 58, 65 (W.D.N.C.1969).

7.  Appellant does not question the authority of the FBI to maintain a record of his detention for other purposes—for example, with an eye towards investigation of the arresting officers under 18 U.S.C. § 242 (1964).  The FBI does not, however, seek to justify retention of the record on this ground.

8.  When the FBI was first explicitly authorized to maintain a system of criminal records in 1930, the Division of Identification and Information was specifically limited to the acquisition and preservation of "criminal identification and other crime records."  5 U.S.C. § 340 (1964), repealed, Pub.L. No. 89-554, § 8(a), 80 Stat. 632, 648 (1966).  Present authority is grounded upon 28 U.S.C. § 534(a) (1) (Supp. IV, 1969), which simply directs the Attorney General to "acquire, collect,

classify, and preserve identification, criminal identification, crime, and other records."  That section, however, was enacted by Pub. L. No. 89-554, § 4(c), 80 Stat. 611, 616 (1966).  Section 7(a) of the Act, 80 Stat. 631, states that "The legislative purpose in enacting sections 1-6 of this Act is to restate, without substantive change, the laws replaced by those sections on the effective date of this Act."

9.  All that was established for that purpose was that appellant had been detained for two days by the California police and released without a judicial hearing; that the FBI maintained a record of his detention; the contents of the record, see note 1, supra; and that appellees had no knowledge of any crime committed by appellant or incident to his detention.

10.  See, e. g., W. LaFave, Arrest 63-164, 300-318 (1965); J. Skolnik, Justice Without Trial 71-90 (1966); Goldstein, Police Discretion not to Invoke the Criminal Process: Low-Visibility Decisions in the Administration of Justice, 69 Yale L.J. 543 (1960); Note, Prosecutor's Discretion, 103 U.Pa.L.Rev. 1057 (1955); cf. Dixon v. District of Columbia, 129 U.S.App.D.C. 341, 394 F.2d 966 (1966).

11.  Calif.Penal Code, § 11115 (West Supp. 1970).

12.  Except perhaps for consequences under California law, it is questionable whether the statute's command that such incidents

lished on the motion for summary judgment would differentiate the incident involving appellant from any other arrest and release without charge. Appellant does not suggest that Congress intended to deny the FBI power, in some circumstances at least, to maintain records of an arrest not followed by the filing of formal charges. "On summary judgment the inferences to be drawn from the underlying facts contained in [the supporting] materials must be viewed in the light most favorable to the party opposing the motion."[13] Accordingly, appellant's motion for summary judgment was properly denied.[14]

## II.

■ Appellees, on the other hand, would have us uphold the award of summary judgment in their favor on the theory that, once it be admitted that appellant was arrested by the California police, they are justified in maintaining his fingerprints and a record of his detention in the criminal identification files of the FBI.[15] We do not find the question so simple.

■ Information denominated a record of arrest, if it becomes known, may subject an individual to serious difficulties. Even if no direct economic loss is involved, the injury to an individual's reputation may be substantial.[16] Economic losses themselves may be both direct and serious. Opportunities for schooling, employment, or professional licenses may be restricted or nonexistent as a consequence of the mere fact of an arrest, even if followed by acquittal or complete exoneration of the charges involved.[17] An arrest record may be

shall be deemed "detentions" only has a significant effect in practice. Appellant's FBI file did not originally differentiate what had happened to him from an ordinary arrest, see note 1 supra. A letter from the California Department of Justice, attached as an exhibit to appellant's motion for summary judgment, refers in the first paragraph to "your arrest" before stating, in the second paragraph, that "you were * * * not deemed to have been arrested." Finally, appellees' brief refers to appellant's "local arrest record" (p. 1) and "his arrest" (p. 16 n. 24), and justifies retention of the material at issue because of the "need to permit retention of arrest and identification data." (p. 17).

13. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); see Adickes v. S. H. Kress & Co., 398 U.S. 144, 153, 90 S.Ct. 1598, 1606–1610, 25 L.Ed.2d 142 (1970).

14. Appellant also argues that Calif.Penal Code, § 849(b) (1) (West Supp.1970) was intended to prohibit the sending of "detention" records by the California authorities to the FBI, and that the state policy expressed thereby should be enforced by a federal court against federal officials. Even if California law could control the FBI's authority to maintain arrest records, compare United States v. Georgia Public Service Commission, 371 U.S. 285, 292–293, 83 S.Ct. 397, 9 L.Ed. 2d 317 (1963), this argument overlooks Calif.Penal Code, § 11115 (West Supp.

1970), which clearly contemplates that such records may be sent to the FBI: for § 11115 requires that, if such a record has been sent, certain followup information must be transmitted as well.

15. Appellees also argue that the instant suit must be dismissed as an unconsented suit against the United States. See note 36 infra.

16. At common law, the accusation that an individual has been arrested for crime is actionable per se. Hanson v. Krehbiel, 68 Kan. 670, 75 P. 1041 (1904); Brewer v. Chase, 121 Mich. 526, 80 N.W. 575 (1899). And see, e. g., N. Y. Times, July 17, 1966, at 54, col. 7, referring generally to persons whose fingerprints are sent to the FBI after arrest as "criminals."

17. A survey by the New York Civil Liberties Union indicated that 75% of New York area employment agencies would not accept for referral an applicant with an arrest record. Sparer, Employability and the Juvenile Arrest Record 5 (Center for the Study of Unemployed Youth, New York University) (pamphlet). Another survey of 75 employers indicated that 66 of them would not consider employing a man who had been arrested for assault and acquitted. Schwartz & Skolnik, Two Studies of Legal Stigma, 10 Social Prob. 133 (1962). At the very least, an arrest record is likely to lead to further investigation; and if it is convenient to fill the job before the investigation is complete, the applicant is effectively denied

used by the police in determining whether subsequently to arrest the individual concerned,[18] or whether to exercise their discretion to bring formal charges against an individual already arrested.[19] Arrest records have been used in deciding whether to allow a defendant to present his story without impeachment by prior convictions,[20] and as a basis for denying release prior to trial or an appeal;[21] or they may be considered by a judge in determining the sentence to be given a convicted offender.[22]

■■ Adverse action taken against an individual because of his arrest record is premised upon certain assumptions regarding the meaning of an arrest.[23] Insofar as these assumptions differ from reality, the adverse actions will have an erroneous basis.[24] We do not understand appellees to be asserting, for example, that they would be entitled to maintain, use, or disseminate the records at issue if no arrest had ever taken place. Yet it is not obvious to us why a different rule should obtain if the arrest was made without probable cause. There is, to say the least, serious question whether the Constitution can tolerate any adverse use of information or tangible objects obtained as the result of an unconstitutional arrest of the individual concerned.[25] Even if an unlawful arrest may, for some purposes, subsequently be legitimized by the later development of incriminating information,[26] it is hard to see how an arrest not based on probable cause, followed by complete

employment because of his record. *See* Hess & Le Poole, Abuse of the Record of Arrest Not Leading to Conviction, 13 Crime & Delinquency 494, 496 (1967).

18. LaFave, *supra* note 10, at 287–289.

19. *Id.* at 141–142.

20. *Cf.* Suggs v. United States, 132 U.S. App.D.C. 337, 340, 407 F.2d 1272, 1275 (1969).

21. Russell v. United States, 131 U.S.App. D.C. 44, 45, 402 F.2d 185, 186 (1968); Rhodes v. United States, 275 F.2d 78, 81–82 (4th Cir. 1960) (Sobeloff, C. J.).

22. *See, e. g.,* the sentencing transcript in United States v. Isaac, 299 F.Supp. 380 (D.D.C.1969).

23. This may be so more often than we would like to think. The American Bar Association's Advisory Committee on Sentencing and Review strongly recommended the exclusion from presentence reports of any mention of charges not leading to conviction:

> Arrests, juvenile dispositions short of an adjudication, and the like, can be extremely misleading and damaging if presented to the court as part of a section of the report which deals with past convictions. If such items should be included at all—and the Advisory Committee would not provide for their inclusion—at the very least a detailed effort should be undertaken to assure that the reader of the report cannot possibly mistake an arrest for a conviction.

American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Probation § 2.3, at 37 (Tent. draft 1970).

24. Even if the assumptions are accurate, an arrest record may be used in ways that should be difficult if not impossible to tolerate. Presumably the fact of arrest indicates some possibility that the individual concerned engaged in the criminal activity with which he was charged. Investigation may disclose whether he has or not. Yet so long as there exists an employable pool of persons who have not been arrested, employers will find it cheaper to make an arrest an automatic disqualification for employment. *See* Hess & Le Poole, *supra* note 17, at 496.

25. Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Needless to say, federal officials may not escape this principle by reliance on the fact that the unlawful arrest was made by state officials. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

26. For example, even if no probable cause existed at the time of arrest, one is not generally entitled to release if probable cause has subsequently been developed. Albrecht v. United States, 273 U.S. 1, 5–6, 47 S.Ct. 250, 71 L.Ed. 505 (1927) (Brandeis, J.). Similarly, a suit for false arrest may not normally be maintained if the arrest was followed by conviction, regardless of the validity of the arrest at the time it was made. *See* Restatement (Second), Torts §§ 119, 121; Restatement, Torts §§ 653, 658.

exoneration of the person arrested,[27] could be used to support any adverse inferences whatsoever regarding him. We do not understand appellees to be suggesting that the uses made of appellant's arrest record will be benign; in consequence, if appellant can show that his arrest was not based on probable cause [28] it is difficult to find constitutional justification for its memorialization in the FBI's criminal files.

■ Even if the arrest was made with probable cause, it does not necessarily follow that no relief may be warranted. Particularly if the FBI has actual knowledge that further investigation exonerated appellant,[29] it may be under a duty at the very least to supplement its files to indicate that fact.[30] Of course no system of records may reasonably be expected to contain every scrap of information about a particular incident, and presumably the FBI is vested with substantial discretion in determining how detailed their criminal identification files shall be. Yet it is clear that the government may not, wittingly or unwittingly, engage in wanton defamation of individuals and groups,[31] and there is limit beyond which the government may not tread in devising classifications that lump the innocent with the guilty.[32] Of course the point at which that limit has been passed may vary with the extent to which the information may be disseminated; that is, a record may be sufficiently complete for some purposes but woefully inadequate for others. The present record gives no indication of the extent to which appellant's record may be disseminated, within or without the government,[33] or of the uses to which it may be put.[34] Even if

27. Appellant claims that he was originally picked up simply for proximity to evidence indicating that a crime might have been committed. The investigation which followed, he says, did not merely exonerate him from commission of a crime that had actually occurred, but in fact showed that the crime for which he was arrested had never taken place.

28. And that probable cause was not later developed. This qualification may not be necessary to obtain deletion of appellant's fingerprints. Davis v. Mississippi, *supra* note 25.

29. Under Calif.Penal Code, § 11115 (West Supp.1970), if appellant's record was sent to the FBI by California authorities, those same authorities are responsible for informing the FBI of the reason for appellant's discharge. However, although appellees appear in their brief to represent that the information came to them from the California police, they denied this allegation in appellant's complaint, and a lett-- to appellant from the California Department of Justice, attached as an exhibit to his motion for summary judgment, denies that California officials forwarded his fingerprints to the FBI.

30. That is, although the FBI may be under no duty in the first instance to go beyond the information sent them by local police departments, if they have done so it may be incumbent upon them to make use of the information so acquired. *Cf.*

Cafeteria and Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The extent of the FBI's knowledge of the incident should be examined on remand.

31. Watkins v. United States, 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1967); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 153, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

32. *Compare* Boorda v. Subversive Activities Control Board, 137 U.S.App.D.C. 653, 421 F.2d 1142 (1969), cert. denied, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970).

33. By statute, appellant's record is subject to dissemination to "authorized officials of the Federal Government, the States, cities, and penal and other institutions." 28 U.S.C. § 534(a) (2) (Supp. IV, 1969). The Attorney General has issued a regulation making clear that, in his view, dissemination is not limited even to government officials of one kind or another; the list of authorized recipients includes government agencies in general; most banks; insurance companies; and railroad police. 28 C.F.R. § 0.85(b) (1970).

34. A government agency may not escape responsibility for improper use of material disseminated by it simply because the improper use is not mandatory and is in fact made by a third party. National Student Ass'n v. Hershey, 134 U.S.App. D.C. 56, 412 F.2d 1103 (1969).

we assume that the cryptic reference on appellant's fingerprint card to release "in accordance with 849(b) (1)" would be understood by police, it is questionable whether it would be understood by potential employers or the general public. If appellant can show that his record may, as he alleges, be widely disseminated,[35] it may well be that he has a right to limit its dissemination or to require its amplification.[36]

### III.

We do not underestimate the magnitude of the problems suggested by the present record. It is certain that, every year, a multitude of persons guilty of no criminal activity are arrested and charged with crime. An arrest may be made if there is "probable cause" to believe that an offense has been committed and that the person to be arrested committed it. Since "probable cause" necessarily implies substantially less than absolute certainty,[37] it follows that a significant number of those arrested will not in fact have committed the offense for which they have been detained.[38]

But this by no means exhausts the scope of the problem. Many individuals have unjustly acquired arrest records without even the excuse of an honest and unavoidable mistake by the police. In the District of Columbia alone, literally thousands of persons were once arrested "for investigation" and then released;[39] but their records often remain.[40] Dragnet arrests are at best matters of recent memory.[41] Even

---

35. It may even be that this information would be released to the press were appellant subsequently to be charged with crime. 28 C.F.R. § 50.2(b) (3) (i) specifically authorizes release of age, employment, marital status, and "similar background information" regarding defendants, and § 50.2(b) (4) explicitly authorizes release of federal criminal conviction records. Arrest records are nowhere mentioned; their release is neither explicitly authorized nor banned.

36. Appellees' final contention is that the present suit must be dismissed as an unconsented suit against the United States. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). These cases, however, make clear that an action against a government officer is not a suit against the United States if the action complained of is "not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void." Malone, supra, 369 U.S. at 647, 82 S.Ct. at 983, quoting Larson, supra, 337 U.S. at 702, 69 S.Ct. at 1467. Such is precisely the claim made in the present case.

37. See, e. g., Hinton v. United States, 137 U.S.App.D.C. 388, 390–391, 424 F.2d 876, 878–879 (1969) and cases cited.

38. Presumably, the guilty are more likely to be prosecuted than the innocent. In consequence, one would expect that the class of individuals arrested but not prosecuted would contain a substantially lower proportion of guilty persons than the class of all persons arrested.

39. During the years 1961 and 1962, more than 6800 persons in the District of Columbia were arrested "for investigation." About 6000 of those arrested were released without being charged with any offense whatsoever. Report and Recommendations of the Commissioners' Committee on Police Arrests for Investigation 97–102 (1962).

40. Id. at 67–68. We have no information with respect to the extent to which records of such arrests were transmitted to, and retained by, the Federal Bureau of Investigation.

41. As recently as 1958, police seeking three "stocky" young blacks who had robbed a restaurant rounded up some ninety suspects; sixty-seven of these were held overnight before being released. The one man finally charged with the offense was not among those originally rounded up. See Trilling v. United States, 104 U.S. App.D.C. 159, 172 n. 11, 260 F.2d 677, 690 n. 11 (1958) (opinion of Bazelon, J.).

worse are those occasions, far more common than we would like to think, where invocation of the criminal process is used—often with no hope of ultimate conviction—as punitive sanction.[42] Hippies [43] and civil rights workers [44] have been harassed and literally driven from their homes [45] by repeated and unlawful arrests, often made under statutes unconstitutional on their face.[46] Innocent bystanders may be swept up in mass arrests made to clear the streets either during a riot or during lawful political demonstrations.[47] Use of the power to arrest in order to inflict summary punishment is, of course, unconstitutional; [48] but even if the arrest was made lawfully and with the best of intentions,[49] if the person arrested has been exonerated it is difficult to see why he should be subject to continuing punishment by adverse use of his "criminal" record.

The very seriousness of the problem underscores the necessity for a clear and complete factual record as a basis for adjudication.[50] We are not unaware of many considerations which might lead to the conclusion that the maintenance of arrest records is a matter properly committed to the discretion of the Department of Justice, subject of course to such rules as Congress and the President may see fit to impose.[51] But

42. *See, e. g.*, LaFave, *supra* note 10, at 146–147, 149–150, 471–482.

43. Wheeler v. Goodman, 298 F.Supp. 935 (W.D.N.C.1969) ; Hughes v. Rizzo, 282 F.Supp. 881 (E.D.Pa.1968).

44. *E. g.*, Dombrowski v. Pfister, 380 U.S. 479, 80 S.Ct. 1116, 14 L.Ed.2d 22 (1965) ; United States v. McLeod, 385 F.2d 734 (5th Cir. 1967) ; McSurely v. Ratliff, 282 F.Supp. 848 (E.D.Ky.1967) (three-judge court).

45. Wheeler v. Goodman, *supra* note 43.

46. *E. g.*, Dombrowski v. Pfister, *supra* note 44; Wheeler v. Goodman, 306 F.Supp. 58 (W.D.N.C.1969) (three-judge court).

47. *See, e. g.*, Report of the National Advisory Commission on Civil Disorders 72 (1968) ; Report of the Chicago Riot Study Committee 43 (1968) ; D. Walker, Rights in Conflict (1968) ; Comment, The Administration of Justice in the Wake of the Detroit Civil Disorder of July 1967, 66 Mich.L.Rev. 1542, 1628– 1629 n. 411 (1968) ; Comment, Criminal Justice in Extremis: Administration of Justice During the April 1968 Chicago Disorder, 36 U.Chi.L.Rev. 455, 479–483 (1969). *See also* the fact situations disclosed by, *e. g.*, Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) ; Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) ; Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

Recently, a protest march on the Watergate Apartments in the District of Columbia resulted in the arrest of over 140 persons. On subsequently reviewing the evidence, Assistant Corporation Counsel Robert H. Campbell concluded that many of the persons arrested were guilty of nothing and in fact were "trying to move on" when they were arrested. Assistant Corporation Counsel Thomas Johnson noted that in several cases, the persons arrested were students on the campus of George Washington University who were "doing nothing and got arrested." Washington Post, February 20, 1970, at A1, col. 7; Feb. 21, 1970, at B4, col. 1; Feb. 28, 1970, at A7, cols. 1, 2.

48. United States v. Price, 383 U.S. 787, 799, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

49. *Cf.* Hill v. United States, 135 U.S.App. D.C. 233, 418 F.2d 449 (1968) ; Hutcherson v. United States, 120 U.S.App.D.C. 274, 281, 345 F.2d 964, 971 (Bazelon, C. J., concurring), cert. denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965).

50. United Public Workers of America (CIO) v. Mitchell, 330 U.S. 75, 86–91, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

51. Obviously, those responsible for investigating and prosecuting criminal activity should have the primary responsibility for determining what information will be most helpful in carrying out their task; and so long as they do not infringe the rights of individuals, the courts may not interfere. Similarly, those responsible for maintaining a system of information must bear the responsibility in the first instance for assuring that inaccurate or

such discretion, assuming it exists, may not be without limit. Particularly troublesome is the possibility, by no means eliminated on the present record, that information in the FBI's files may be used for many other than the law enforcement purposes for which its retention may be justified.[52] The short of the matter is that the facts established on the cross-motions for summary judgment were simply inadequate for proper resolution of the complex questions presented. Accordingly, the judgment of the District Court granting appellees' motion for summary judgment is reversed and the case remanded for trial.

So ordered.

---

misleading information is not used to an individual's detriment. Appellant here alleged that prior to filing the instant suit he had sought relief from appellees but had been told that they had "no authority" to do as he requested. We would urge the Department of Justice to clarify and make public its views regarding its own authority to correct or delete information in its files; and should it find that it has such authority, to devise procedures whereby complaints such as the present one may be handled at an administrative level.

Any such procedure would be a substantial improvement over a remedy that required any individual anticipating adverse consequences from an inaccurate record to bring a lawsuit in order to protect himself. But we must recognize that, without more, even a full system of administrative remedies cannot be the final answer. Realistically, the FBI cannot be expected to investigate the facts underlying every arrest or detention reported to it; the most it can do is examine the report on its face and, perhaps, investigate further if a complaint is received from the individual concerned. For most of those arrested—too poor, too ignorant, and often too disheartened to complain—the only adequate remedy may lie either in severely curtailing any use of records of arrest, or in eliminating altogether their maintenance in a file associated with the individual's name.

52. For example, New York State recently passed a statute requiring all employees

---

of securities firms to be fingerprinted, and providing that the fingerprints so obtained be transmitted to the state's Attorney General "for appropriate processing." New York State Laws 1969, ch. 1071, codified as N.Y.General Business Law, § 359–e(12) (McKinney's Consol.Laws, c. 20, Supp.1969). As a result of this statute, several hundred employees have been found to have "criminal records" and dismissed from their employment; half of those fired had no record of convictions, but only of arrests. New York Times, February 5, 1970, at 1, col. 2; Wall Street Journal, February 5, 1970, at 17.

It appears that the "appropriate processing" is carried out by the New York State Identification and Intelligence System, which is apparently one of those state agencies authorized to receive information from the FBI's files. 28 U.S.C. § 534(a) (2) (Supp. IV, 1969). Since no New York statute provides for automatic dismissal of a securities employee with a past arrest record, presumably the information must be passed on to the employer before an individual may be fired. Although 28 U.S.C. § 534(b) (Supp. IV, 1969), provides that the exchange of records authorized by § (a) (2) is "subject to cancellation if dissemination is made outside the receiving departments or related agencies," we have no indication that this provision is regarded as mandatory or whether it is in fact ever enforced.