HOUSTON CHRONICLE PUBLISHING COMPANY, Appellant,

v.

CITY OF HOUSTON et al., Appellees.

No. 1116.

Court of Civil Appeals of Texas, Houston (14th Dist.).

Nov. 26, 1975.

Rehearing Denied Dec. 17, 1975.

W. Robert Brown, Robert J. King, Liddell, Sapp, Zivley & Brown, Houston, for appellant.

Jonathan S. Day, Frank L. Mauro, Houston, for appellee.

Mary Joe Carroll (Texas Daily Newspaper Assn.), Clark, Thomas, Denius, Winters & Shapiro, Austin, David M. Kendall, Asst. Atty. Gen., Austin, amicus curiae.

CURTISS BROWN, Justice.

The City of Houston, through its police department, maintains a number of forms, records, and instruments relating to police activities, criminal investigations, and incarceration of persons in the jail facilities.

One of these records is called an "Offense Report." This report includes: the offense committed, location, identification and description of complainant, premises, time of the occurrence, property involved, vehicles involved, identification and description of witnesses, weather, details of the offense in question, and the names of the investigating officers. Supplementary Offense Reports are frequently added, which may include such items as a synopsis of a purported confession, officers' speculations about a suspect's guilt, investigating officers' views on a witness's credibility, statements by informants, ballistics reports, fingerprint comparisons, and blood and other laboratory tests. Under the evidence, the material contained in the Offense Report is broad enough to justify the inference that it could also include matters such as the results of polygraph tests, the refusal to take such tests, paraffin test results, and spectrographic or other investigative reports.

The "Personal History and Arrest Record" relates to the arrests and criminal activities of individuals. It contains various identifying numbers, name, race, sex, aliases, place and date of birth, and physical description, with particular emphasis on scars and tattoos. Other personal information included relates to occupation, marital status, and relatives. A mug shot, palm prints, fingerprints, and similar information are included, along with the signature of the arrested party. The principal information maintained by this record is the chronological history of any arrests of that individual. In the event additional arrests are

made, they are simply added to the record. The information shows the offense, time of arrest, booking number, location, and arresting officers. This record may or may not be updated to provide information concerning the disposition of the matter. The length of this compilation of arrests depends on the number of times the individual has been handled by the police.

Another record is the "Houston Police Blotter." This form includes the arrestee's social security number, name, alias, race, sex, age, occupation, address, "I.D." number, and physical condition. The Blotter also shows by whom the arrest was made, the date and time thereof, and booking information, as well as the charge made and the court in which it was filed. Details of the arrest are also given. This record notes any release or transfer, and bonding information.

A record known as a "Show-up Sheet" is maintained for each twenty-four hour period, showing in chronological order the name of each person arrested in Houston. This record lists in numbered order the arrested individual's name, age, and Houston identification number, the place of arrest, the officers through whom the arrest was effected, and numbers for what may be statistical purposes relating to the modus operandi or "M.O." of those apprehended.

Also maintained is what is called an "Arrest Sheet," which is somewhat similar to the Show-up Sheet. This record reflects the arrests made from 8:00 A.M. one day to the same hour the next. It simply lists in numbered order the name, race, and age of the suspect. In addition it states the place of arrest, the names of the arresting officers, and the offense for which the suspect was arrested.

For as long as veteran newspaper editors and reporters could recall, the police department had routinely given access to members of the accredited media to the Offense Reports and to the Personal History and

Arrest Records. This practice had not always been followed by the Narcotics Division. However, this division was following the same practice on June 14, 1973, the effective date of Tex.Rev.Civ.Stat.Ann. art. 6252–17a (Supp.1974) (hereinafter referred to as the Open Records Act). There is some indication that in rare instances the investigating officers might deny access to the Offense Reports temporarily to avoid hindering the investigation or to facilitate the making of an arrest. Even on these occasions the Offense Report ultimately became available to the press.[1] In the case of Personal History and Arrest Records, access was had by a limited number of persons and corporations. The access of these persons and corporations was much more restricted than that of the press. In general these persons and corporations consisted of large employers inquiring into the criminal records of prospective employees. The restrictions included the permission of the individual involved for the examination of his or her record and the agreement to hold the City harmless from liability. Certain credit agencies had such privileges under similar guidelines. Insurance companies and relatives of victims were likewise permitted to view these records under some circumstances.

With the exception of the Police Blotter, all of the records maintained by the department and outlined above were available to the press on the effective date of the Open Records Act. The importance of these records to the press for use in the reporting of crimes of interest to the public is undisputed. The record is replete with the expert opinion of highly qualified editors and criminal news reporters that reporting of crime to the interested public would be damaged, hindered, and hampered by the unavailability of these records. The two most important records, and the ones most at issue here, are the Offense Report and the Personal History and Arrest Record.

1. When the word "press" is used in this opinion, it is intended to include all newspa-

per, radio, television, magazine, and other media, unless otherwise indicated.

The evidence is that without such records there would be "holes" in the news story. Furthermore, the press has an obligation to the public to inform them of police activities. In order to accomplish this it must obtain the news. When a paper can no longer obtain the news it cannot remain a successful newspaper. The Offense Reports represent a handy vehicle at a central location which enables a reporter on a criminal beat to evaluate the newsworthiness of the crime in question, the newsworthiness of the persons involved, and the effectiveness of our law enforcement agencies and ultimately our judicial processes. The usefulness of the Personal History and Arrest Record or "rap sheet" is not so clear, except as to identify notorious, flagrant, and habitual offenders. The use of this material obviously involves a weighing of conflicting valid interests. While there may have been isolated cases of abuse, the record in this case would reflect that such access to these materials has been used responsibly by the press in discharge of a high public purpose.

The practices outlined above were continued until a series of events in January of 1974. The Houston Post requested that the airport security arrest records for the year previous be made public. The City declined the request and requested an Attorney General's opinion. In Open Records Decision No. 18 (January 15, 1974) the Attorney General ruled that the information sought was protected from public disclosure because it constituted arrest records dealing with the detection and investigation of crime, and were records maintained for internal use by the agency in law enforcement. The City Attorney of Houston had issued, on the day previous, his opinion that expressed the view that arrest and offense information were rendered confidential by the provisions of the Open Records Act.

Not surprisingly, representatives of the news media were shocked to discover that legislation that was declared to be for the purpose of opening up to public scrutiny functions of government was being construed to deny access to reports previously available to the press. Following the hue and cry thus raised, the Attorney General took occasion to render his Open Records Decision No. 18A on March 25, 1974. In this decision he adhered to the opinion expressed in Open Records Decision No. 18, but expanded his opinion to include the view that the Act does not disturb the right of police agencies to continue to make available to the press factual information concerning arrests that was customarily furnished prior to the passage of the law. He further expressed the view that the custodian should cooperate in abstracting such information from records that are otherwise unavailable, so long as no confidentiality or right of privacy established by constitution, by statute, or by the courts is violated.

Responding to the second opinion of the Attorney General, the City has followed the policy of allowing media access to Offense Reports, but reserving the right to withhold them if deemed advisable. The City has continued throughout to refuse to allow inspection of Personal History and Arrest Records as permitted before January 14, 1974.

An important segment of the Houston media, the Houston Chronicle Publishing Company (the Chronicle or appellant), refused to accept the City's posture and instituted this suit against the City of Houston (City or appellees), the Mayor, and the Chief of Police, seeking a declaratory judgment pursuant to Tex.Rev.Civ.Stat.Ann. art. 2524–1 (1965) and an injunction. The Chronicle sought a declaration that the Open Records Act established a statutory right of access to Offense Reports and Personal History and Arrest Records, and that the policies of the City of Houston in exercising discretion in the release of the former and denying access to the latter were in violation of that statute. In addition, the Chronicle prayed that it be declared that the above policies of the City of Houston violated its right to freedom of the press as guaranteed by the first amendment

of the Constitution of the United States and by the Bill of Rights contained in the Constitution of the State of Texas.

Trial was to the court on the merits. In the judgment of the court below it was held that the Open Records Act did not provide a statutory right for denial of the inspection of the Offense Reports and Personal History and Arrest Records, and the City was enjoined from denying access to the records on this ground. It also declared that the Open Records Act did not provide the Chronicle any statutory right of access to such records. The trial court further found that sections 3(a)(1), 3(a)(8), 6(1), 6(15), and 14(a) of the Open Records Act, considered separately and together, are improperly overbroad, vague, in conflict with each other, an unauthorized delegation of a legislative function, discriminatory as between various areas of the state and among the agencies within the same localities, and provide no objective standards for discretionary policies. Accordingly, it was decreed that the above cited sections were void, severed, and rendered unenforceable. Finally, all relief not specifically granted or denied was denied. The Chronicle and the City duly excepted and perfected this appeal.

█ The Attorney General of the State of Texas was notified of the trial and sent an observer. However, the Attorney General did not intervene and did not formally participate in the trial of the case. He has filed a brief seeking to intervene on the appellate level. Our attention has not been directed to any rule or case permitting such an intervention after appeal. We, therefore, denied such motion for intervention. However, the Attorney General has filed a brief which we have fully considered as amicus curiae. We have also been favored with an excellent amicus curiae brief filed by the Texas Daily Newspaper Association.

The case presents important questions to our jurisprudence in at least three respects: (1) Constitutionality of the Open Records Act, particularly the sections declared unen-forceable by the trial court; (2) Construction of the Open Records Act as it may involve records of law enforcement agencies; (3) Existence and extent of the right of the press to have access to public records under the freedom of press granted by the first amendment of the Constitution of the United States and the Bill of Rights of the Constitution of the State of Texas. We shall discuss these three important questions separately.

## I. Constitutionality of the Act

In connection with the constitutionality of the Act (or certain parts thereof), it should be noted that neither the Chronicle nor the City has raised points complaining of the trial court's ruling in this regard. However, the importance of the Open Records Act and its impact on the right to know of the citizens of this state is of sufficient public interest to justify our consideration of all of such matters as fundamental error. *Ramsey v. Dunlop*, 146 Tex. 196, 205 S.W.2d 979 (1947).

The five sections of the Open Records Act which the trial court held were overbroad, vague, conflicting, unauthorized delegation of legislative function, and discriminatory as between various areas and among governmental agencies were: 3(a)(1) (exception of information being confidential by constitutional, statutory, or judicial law); 3(a)(8) (exception of records of law enforcement agencies that deal with detection and investigation of crime and the internal records and notations of such agencies which are maintained for internal use in matters relating to law enforcement); 6(1) (making specifically available reports, audits, evaluations, and investigations made of, for, or by, governmental bodies upon completion); 6(15) (making specifically public information currently regarded by agency policy as open to the public); 14(a) (allowing any governmental body to make available any of its records to the public, unless expressly prohibited by law, provided that such

records shall then be available to *any*[2] person).

■ It is appropriate that we should note at this time that neither the City nor the Chronicle pled the alleged unconstitutionality of the Open Records Act.[3] The Chronicle has consistently maintained that it has a constitutional right under "freedom of the press" to access to the materials in question. This claim is predicated upon the first amendment to the Constitution of the United States and to the Bill of Rights of the Texas Constitution. The "unconstitutionality" of a statute is an affirmative defense which must be pled under Tex.R.Civ.P. 94. In the absence of an appropriate pleading raising the issue of unconstitutionality, the trial court was without authority to include these findings in its judgment. *University of Texas System v. Robert E. McKee, Inc.,* 521 S.W.2d 944 (Tex.Civ.App.—Eastland 1975, writ ref'd n. r. e.); *City of South Houston v. Sears,* 488 S.W.2d 169 (Tex.Civ. App.—Houston [14th Dist.] 1972, no writ).

■ In view of the importance of the question we elect not to dispose of the issue of constitutionality on the basis of the failure to plead an affirmative defense under Rule 94. The legislation is presumptively valid, and we hold that the sections under attack here are constitutional. The judgment of the trial court might be more properly characterized as "overbroad" or "vague," because it is impossible to ascertain whether the court intended all stated grounds to be applicable to all stated sections held to be unconstitutional, or whether some were deemed applicable to one section and another to others. These sections are understandable to a person of common intelligence, and therefore are not overbroad or vague. *See State v. Spartan's Industries, Inc.,* 447 S.W.2d 407 (Tex.Sup.

1969), *appeal dismissed,* 397 U.S. 590, 90 S.Ct. 1359, 25 L.Ed.2d 596 (1970); *Texas Liquor Control Board v. Attic Club, Inc.,* 457 S.W.2d 41 (Tex.Sup.1970), *appeal dismissed,* 400 U.S. 986, 91 S.Ct. 459, 27 L.Ed.2d 435 (1971). These sections are not conflicting because we interpret them in such a manner that all can stand. *See Martin v. Sheppard,* 129 Tex. 110, 102 S.W.2d 1036 (1937); *Black v. American Bankers Insurance Co.,* 478 S.W.2d 434 (Tex.Sup.1972). Furthermore, we construe this statute as a whole and will give harmonious effect to all its provisions. *See National Surety Corp. v. Ladd,* 131 Tex. 295, 115 S.W.2d 600 (1938); *Board of Ins. Com'rs v. Great Southern Life Ins. Co.,* 150 Tex. 258, 239 S.W.2d 803 (1951); *Perkins v. State,* 367 S.W.2d 140 (Tex.Sup.1963). We reverse the judgment of the trial court finding sections 3(a)(1), 3(a)(8), 6(1), 6(15), and 14(a) of Article 6252–17a to be void and unenforceable, and render judgment that they are valid and enforceable.

## II. *Construction of the Act*

■ The briefs of the parties have been most helpful in directing our attention to applicable principles of statutory construction. Section 1 of the Open Records Act eloquently states the purpose of the legislation:

> Pursuant to the fundamental philosophy of the American constitutional form of representative government which holds to the principle that government is the servant of the people, and not the master of them, it is hereby declared to be the public policy of the State of Texas that all persons are, unless otherwise expressly provided by law, at all times entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as pub-

---

2. Emphasis added unless otherwise indicated.

3. Although not contained in any pleading, the Chronicle filed a· memorandum of authorities with the trial court in which it stated:

Alternatively, the statute is constitutionally overbroad and violative of freedom of the press to gather news and the public to be informed.

lic officials and employees. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created. To that end, the provisions of this Act shall be liberally construed with the view of carrying out the above declaration of public policy.

Section 14(d) of the Act provides:

This Act shall be liberally construed in favor of the granting of any request for information.

Other rules of statutory construction are properly applicable to some aspects of this case. When two sections of an act apply, and one is general and the other is specific, then the specific controls. *Lufkin v. City of Galveston*, 63 Tex. 437 (1885). Legislative intent is the essence of law, and such intent should be enforced rather than thwarted. *Lone Star Gas Co. v. State*, 137 Tex. 279, 153 S.W.2d 681 (1941); *City of Mason v. West Texas Utilities Co.*, 150 Tex. 18, 237 S.W.2d 273 (1951); *Greyhound Lines, Inc. v. Board of Equalization*, 419 S.W.2d 345 (Tex. Sup.1967). In construing the civil statutes, "[t]he ordinary signification shall be applied to words . . . ." Tex.Rev.Civ.Stat. Ann. art. 10 (1969).

The fundamental rule of statutory construction perhaps was best stated in *Texas Highway Commission v. El Paso Bldg. & Const. Tr. Coun.*, 149 Tex. 457, 234 S.W.2d 857 (1950), approved and quoted by the supreme court in *Railroad Commission v. Miller*, 434 S.W.2d 670, 672 (Tex.Sup.1968):

Courts must take statutes as they find them. More than that, they should be willing to take them as they find them. They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language, and not elsewhere. They are not the lawmaking body. They are not responsible for omissions in legislation. They are responsible for a true

and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain.

*See also Texas Ind. Acc. Bd. v. Industrial Foundation*, 526 S.W.2d 211 (Tex.Civ.App.—Beaumont 1975, writ granted).

 As is often the case, the rules of statutory construction are more easily stated than applied. As declared in section 1, the Open Records Act is structured to achieve laudable public assess to government records and information concerning official activities. The second section, consisting of definitions, is not material here except that it is entirely clear that the City and the police department are subject to the Act. Section 3 makes all information public, with sixteen specific exceptions. This section is crucial to the construction of the Act here. The first exception, contained in section 3(a)(1), is "information deemed confidential by law, either Constitutional, statutory, or by judicial decision." Section 3(a)(8) is critical, reading "records of law enforcement agencies that deal with the detection and investigation of crime and the internal records and notations of such law enforcement agencies which are maintained for internal use in matters relating to law enforcement." Also bearing on this matter is section 3(b), reading in part: "This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section." Section 3(c) provides: "The custodian of the records may in any instance within his discretion make public any information contained within Section 3, Subsection (a) 6, 9, 11, and 15." The significance of this latter portion of the statute is that it does *not* vest the custodian with discretion to release the matters contained in section 3(a)(8). Sections 4 and 5 deal with the means by which access to public information may be obtained, and

have no direct bearing on this suit. Section 6 provides that certain specific information is to be made public. It contains matters bearing on this appeal. Section 6 provides: "*Without limiting the meaning of other sections of this Act,* the following categories of information are specifically made public information: (1) reports, audits, evaluations, and investigations made of, for, or by, governmental bodies upon completion." Section 6(15) specifically makes public "information currently regarded by agency policy as open to the public."

Section 7 outlines the role of the Attorney General in enforcement of the Act and in rendering Open Records Decisions. Normally, opinions of the Attorney General are persuasive but not controlling on the courts. We consider that great weight should be given such opinions when the legislature has specifically delegated to the Attorney General the duty of interpreting the Act and aiding in its enforcement. Sections 9 through 15 of the Act relate to the right to mandamus, costs of copies of public records, prohibition of distribution of confidential information, authorization of a bond for preparation of public records or cash prepayment, penalties, procedures for inspection of public records, interpretation of the Act, and severability. Of these sections, the following have material bearing: 10(a) ("Information deemed confidential under the terms of this Act shall not be distributed," and providing a penalty); 14(a) ("This Act does not prohibit any governmental body from voluntarily making part or all of its records available to the public, unless expressly prohibited by law."); 14(b) ("This Act does not authorize the withholding of information or limit the availability of public records to the public, except as expressly so provided."); and 14(d) ("This Act shall be liberally construed in favor of the granting of any request for information.").

Taking an overview of this legislation, we conclude that with the exception of the sixteen named exceptions from disclosure the legislature expressed an intention to make all[4] records available to the public, including, of course, the press. *Texas Ind. Acc. Bd. v. Industrial Foundation, supra* at 218. The crucial exception to disclosure involved in this case is section 3(a)(8): "records of law enforcement agencies that deal with the detection and investigation of crime and the internal records and notations of such law enforcement agencies which are maintained for its internal use in matters relating to law enforcement." We hold that the records designated as Houston Police Blotter, Show-up Sheet, and Arrest Sheet do not come within the exclusion and are public records available to the press and public. The Offense Report as described in this opinion is a record of a law enforcement agency that deals with the "detection and investigation of crime". The Personal History and Arrest Record is clearly a notation "of such law enforcement agencies which are maintained for internal use in matters relating to law enforcement". Therefore, both of these records fall within section 3(a)(8). These particular records are not made available by section 6(1) or section 6(15), for the reason that section 6 expressly states: "Without limiting the meaning of other sections of this Act . . . ." Therefore, the exclusion contained in section 3(a)(8) is unaffected by this provision. The legislature did not intend for section 6 to diminish the force of the exclusions contained in section 3. Furthermore, the section specifically dealing with records of law enforcement agencies would control over the general provisions of the Act.

### III. *Constitutional Right of Access*

In *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972), the rule is stated:

We do not question the significance of free speech, press, or assembly to the

4. Section 2, by definition, excludes the judiciary from the application of the Act.

country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of press could be eviscerated. However, it has often been said that the first amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974).

■ We hold that the press and the public have a constitutional right of access to information concerning crime in the community, and to information relating to activities of law enforcement agencies. In determining the reach of this constitutional right of access, it is necessary to weigh and evaluate legitimate competing interests. In similarly weighing competing interests, the Supreme Court reached the conclusion that newsmen were not immune from subpoena by a properly functioning grand jury. *Branzburg v. Hayes, supra.* Such weighing of competing interests led the Court to the conclusion that reasonable regulations denying access to individual state and federal prisoners may be sustained. *Pell v. Procunier, supra; Saxbe v. Washington Post Co., supra.* In both instances the Court recognized the caveat of *Branzburg* set out above.

As applied to this case, the competing legitimate interests are clear and important. The first legitimate interest to be considered is the people's right to know. This interest is particularly sensitive and important as applied to police activity. The increasing crime rate is a subject of paramount importance to the public. We have, on the one hand, those who fear that the activities of the police will lead to impositions on the individual in the form of wire tapping or police brutality. Their focus of concern is on the creation of a police state. On the other hand, we have those with a legitimate fear of ever increasing criminal activity, violence, and unsafe streets.

■ The City and State have a legitimate interest in preserving the secrecy of their records from the eyes of defendants and their counsel in criminal actions.[5] The trial of a criminal case is an adversary proceeding. Whatever we hold to be available to the press must also be available to the public. At the present time the records contained in the Offense Report are not available to criminal defense counsel except in cases where good cause is shown in a motion under the discovery provisions of the Code of Criminal Procedure. Tex.Code Crim.Proc.Ann. art. 39.14 (1965). Discovery of such reports has been denied. *Bradshaw v. State,* 482 S.W.2d 233 (Tex.Cr.App.1972).

Furthermore, the State has a legitimate interest in preventing excess publicity which might lead to a denial of due process and endanger the prosecution. *See Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The expense and manpower necessary for the maintenance of appropriate records available to the press and public may be a factor that should be considered, but would seem to be relatively insignificant considering the importance of the matters at issue here.

The Chronicle makes a strong case for the usefulness of the availability of Offense Reports in the discharge of its obligation to inform the public. These reports enable the reporters to evaluate the newsworthiness of the occurrence and the prominence of the victims or perpetrators, which may make the crime newsworthy.

■ With respect to the Offense Report, it seems to us that these legitimate competing interests can be reconciled by the finding of a constitutionally protected right of the press and public to the front

5. We recognize that the suppression by the prosecution of material evidence favorable to an accused upon request violates due process. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

page (or an exact copy thereof) of the Offense Report structured to include the offense committed, location of the crime, identification and description of the complainant, the premises involved, the time of the occurrence, property involved, vehicles involved, description of the weather, a detailed description of the offense in question, and the names of the investigating officers. The disclosure of this information, to which the press is entitled as a matter of constitutionally protected right, will not preclude the press from interviewing the investigating officers and otherwise seeking additional information concerning a newsworthy crime. Along with the other records held in this opinion to be public records under the Open Records Act, the activities of the City of Houston law enforcement agencies will be open to public scrutiny. This constitutional right of access to information should not extend to such matters as a synopsis of a purported confession, officers' speculations of a suspect's guilt, officers' views as to the credibility of witnesses, statements by informants, ballistics reports, fingerprint comparisons, or blood and other laboratory tests. To open such material to the press and public in all cases might endanger the position of the State in criminal prosecutions by the use of such materials to the disadvantage of the prosecution. To have such material open to the press and public in all cases might reveal the names of informants and pose the threat of intimidation of potential prosecution witnesses. In any case, the press has available effective means of finding out most of such details through interviews with the participants, officers, and witnesses. The constitutionally protected access of the press and public to the limited Offense Report as described herein should be made immediately available at a convenient central location to meet the need of the public's right to know.

The Personal History and Arrest Record is an entirely different matter. This record, or "rap sheet," consists of the criminal history of the individual, insofar as it shows each previous arrest and other data relating to the individual and the crimes he has been suspected of committing. Some efforts have been made both by statute and decision to compel the purging or correction of such records. *See Tarlton v. Saxbe*, 165 U.S.App.D.C. 293, 507 F.2d 1116 (1974); *Menard v. Mitchell*, 139 U.S.App.D.C. 113, 430 F.2d 486 (1970); *Davidson v. Dill*, 180 Colo. 123, 503 P.2d 157 (1972); *Eddy v. Moore*, 5 Wash.App. 334, 487 P.2d 211 (1971). *See also* Comment, *Expungment of Arrest Records of Exonerated Arrestees*, 16 S.Tex.L.J. 173 (1975); Annot., 46 A.L.R.3d 900 (1972).

The importance of maintaining this record is obvious. Giving full credit to the presumption of innocence, it would be naive to assume that an individual's arrest history is irrelevant to police activity. We cannot ignore the truth that many guilty men go free and are not even charged in some cases. Many things may contribute to this result, including lack of sufficient proof, illegality of certain seized evidence, crowded court dockets, and other things that cause or justify a failure to prosecute or to convict. It is not unheard of to find some fire where there is much smoke.

While recognizing that law enforcement agencies may have misused these records in some cases, we think their maintenance is essential to the investigation of crime. For example, the authorities charged with the enforcement of criminal law may employ fingerprinting as an appropriate means to identify criminals and to detect crime. *Hansson v. Harris*, 252 S.W.2d 600 (Tex.Civ. App.—Austin 1952, writ ref'd n.r.e.).

We credit the Chronicle's claim that the Personal History and Arrest Record is useful to reporters for "background information." We further recognize that legitimate public inquiry into the operation of the criminal justice system includes such matters as release from jail on personal recognizance or on personal bond, bond policies with respect to repeat offenders, plea bargaining, and sentencing practices.

A holding that the Personal History and Arrest Record must be open to inspection by the press and public would contain the potential for massive and unjustified damage to the individual. The same recognition of reality that compels us to acknowledge the value of these records, despite the presumption of innocence, also compels us to note that many persons who are arrested by the police are wholly innocent. For many years Texas law failed to recognize an enforceable right of privacy. *Hansson v. Harris, supra; Milner v. Red River Valley Publishing Co.,* 249 S.W.2d 227 (Tex.Civ.App.—Dallas 1952, no writ). However, the supreme court in *Billings v. Atkinson,* 489 S.W.2d 858 (Tex.Sup.1973) adopted the rule that an unwarranted invasion of the right of privacy constitutes a legal injury for which a remedy will be granted. Thus, Texas was brought in line with the vast majority of other jurisdictions in recognizing the right of privacy. The United States Supreme Court has indicated that this right may be one of constitutional dimension. *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). However, the right of privacy is not an unlimited one. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). The right of free public discussion of the stewardship of public officials is a fundamental principle of the American form of government. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Also, newsworthy occurrences may justify the invasion of the lives of private citizens. *Compare Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) *with Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

It is noteworthy that the rap sheet in question may or may not reflect a disposition of the charge if, indeed, charges were filed. No effort is made to "purge" inaccurate or misleading entries. While not controlling, 42 U.S.C. § 3701 (Supp.1974) and 42 U.S.C. §§ 3731(a) and 3771(b) (1973), which are part of the act known as the Crime Control Act of 1973, must be considered. It is of legitimate interest to the prevention of crime that the law enforcement agencies have available the information provided by the National Crime Information Center system, which has been partially funded by the Law Enforcement Assistance Administration system. Weighing the need of the media for background information on individuals (which may be obtained through interviews and other sources) against the legitimate competing interest of individual privacy would seem to compel the conclusion that the constitutional right of the press and public to information should not include access to the Personal History and Arrest Record.

## IV. *Judgment*

Therefore, we reverse the judgment of the trial court that sections 3(a)(1), 3(a)(8), 6(1), 6(15), and 14(a) of Article 6252–17a are unconstitutional, void, and unenforceable, and hold that such sections are constitutional. We reverse the judgment of the trial court and hold that the records referred to as the Houston Police Blotter, Show-up Sheet, and Arrest Sheet are public records available to the press and public under the Open Records Act. We hold that the records referred to as the Offense Report and Personal History and Arrest Record are excluded by section 3(a)(8) as being records of law enforcement agencies that deal with the detection and investigation of crime and the internal records and notations of such law enforcement agencies which are maintained for internal use in matters relating to law enforcement, and that this exclusion is not affected by sections 6(1) or 6(15). We reverse the judgment of the trial court and hold that there is a constitutionally protected freedom of the press and public to have access to information maintained by law enforcement agencies relating to crime and criminal activities. This right extends affirmatively to the information contained on the first page of the Offense Report, as described in this opinion.

Reversed and rendered.